UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| David M. O'Neil,<br><br>       Plaintiff,<br><br>  v.<br><br>Putnam Retail Management Limited Partnership,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 05-10469 WGY |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Putnam Retail Management Limited Partnership ("Putnam") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss.

**Introduction**

In July of 1999, Putnam terminated David M. O'Neil ("Mr. O'Neil") for his lack of professionalism in his interactions with Putnam's retirement plan clients and for his excessive absenteeism. Almost six years later, Mr. O'Neil now claims that Putnam violated a federal law that protects the employment rights of members of the armed services, and also seeks to hold Putnam liable for allegedly failing to transfer his NASD licenses. Mr. O'Neil's claims are without merit and are time-barred.

Counts I, II, and III of Mr. O'Neil's Complaint allege violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §4301 et seq., and should be dismissed as barred by the four year statute of limitations set out in 28 U.S.C. §1658. Count IV alleges a breach of an implied contract and should be dismissed as barred by Mass. Gen. Laws ch. 260 §2, which prohibits actions on implied contracts from being brought

more than six years after accrual of the action. In addition, pursuant to Fed. R. Civ. P. Rule 12(b)(6), Count IV should be dismissed for failure to state a claim, as Mr. O'Neil has failed to allege any offer or promise made by Putnam.

### Factual Allegations

Putnam hired Mr. O'Neil as a Retirement Plans Specialist in October 1997. Cmplt. ¶8(a).[1] Putnam was aware when it hired Mr. O'Neil that he was in the United States Naval Reserves. Id. ¶7(b). At the time he was hired, Mr. O'Neil alleges that he held three NASD licenses: Series 7, Series 24, and Series 63. Id. ¶9(a).

Mr. O'Neil alleges that he submitted a Uniform Application for Securities Industry Registration or Transfer, a "U4," sometime in October 1997. Id. ¶8(b). Mr. O'Neil then alleges that he "reasonably assumed" that Putnam would arrange for the transfer of his licenses from his former employer to Putnam. Id. ¶8(b), 49. However, there is no allegation in the Complaint that anyone at Putnam promised or agreed to transfer his licenses, or even that there was an established procedure in place to do so.

In October 1998, after a year of employment, Putnam issued a written warning to Mr. O'Neil for calling a broker and her client "idiots."[2] Cmplt. ¶¶15, 16; (warning attached hereto as Exhibit A). Putnam considered this unprofessional behavior to be a major offense and a violation of Putnam policies. Id. This warning placed Mr. O'Neil on notice of his lack of professionalism in his client interactions and stated that further unprofessional behavior could result in his immediate termination. Id. By virtue of being on warning, Mr. O'Neil also became

---

[1] Mr. O'Neil's Complaint contains two paragraphs for each of numbers 6 through 8. For the avoidance of any confusion, Putnam will use the suffix (a) to indicate the first instance a paragraph number occurs, and the suffix (b) to indicate the second instance.

[2] Because Mr. O'Neil references and relies on these written warnings in the Complaint, Putnam's introduction of them in this Motion to Dismiss is allowed without converting it to a motion for summary judgment. See Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991).

ineligible for certain benefits, including salary increases, for a sixty day warning period. Id.

Within two months, Mr. O'Neil received another written warning for excessive absenteeism in a six month period. Cmplt. ¶¶15, 17; (warning attached hereto as Exhibit B). Specifically, it listed five absences on May 27, 1998; October 2, 1998; October 23, 1998; October 29, 1998; and October 30, 1998. Ex. B. The warning stated that further unwarranted absenteeism in violation of Putnam policies would be grounds for termination. Id. Mr. O'Neil was again placed on a sixty day warning during which period he would not be eligible for certain benefits, including salary increases. Id. As a result of these two warnings in late 1998, Mr. O'Neil did not receive a pay raise in February 1999.[3] Id. ¶21; Ex. B. In July 1999, Putnam terminated Mr. O'Neil's at-will employment. Id. ¶26.

Mr. O'Neil alleges that only after his termination did he learn that his licenses with the NASD had expired. Id. ¶8(b). As a result, he alleges that he was unable to find a job in the investment industry. Id. ¶30. However, nothing prohibited Mr. O'Neil from obtaining a job in the investment industry. See Ex. C, NASD Reg. 1060(a).[4] Nor was Mr. O'Neil prohibited from pursuing new licenses from the NASD. Ex. D, NASD Reg. 1031(c); Ex. E, NASD Reg. 1041(c).[5] In fact, Mr. O'Neil's Complaint is silent as to whether he attempted – at any time – to regain his security licenses.

Nearly six years after his termination, Mr. O'Neil filed this suit on March 11, 2005. Id. ¶34.

---

[3] The second sixty-day warning period did not expire until January 2, 1999. Ex. B.

[4] Mr. O'Neil refers to and relies on the securities industry regulations in his Complaint, and therefore Putnam may introduce these regulations here. See note 2, supra.

[5] The Complaint implies correctly that the licenses are issued by the NASD rather than by Putnam. Notably, Mr. O'Neil acknowledges he had the licenses before he came to Putnam, and that the SEC, not Putnam, is the entity requiring the licenses. Cmplt. ¶¶9(a), 8(b).

**Argument**

I.    **Counts I Through III Should Be Dismissed As Time-Barred By 28 U.S.C. §1658.**

Counts I through III allege violations of USERRA based on events culminating in July 1999. In particular, Mr. O'Neil claims that his military service was one motivating factor in Putnam's decisions to deny him a raise, to prevent him from attending training programs, and ultimately to terminate him. Cmplt. ¶¶37, 41, 45. Mr. O'Neil's USERRA claims are time-barred by the applicable four year statute of limitations. 38 U.S.C. §4311; 28 U.S.C. §1658.

Enacted in 1990, 28 U.S.C. §1658 serves as a federal "catch-all" statute of limitations, and states that "except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. §1658. Since USERRA was enacted in 1994 and does not otherwise provide its own statute of limitations, see 38 U.S.C. §4301 et seq., Mr. O'Neil's USERRA claims are subject to the four year statute of limitations set forth in §1658. See Quick v. Deluxe Corp., No. 4:04-CV-396 (CEJ), 7 (E.D.Mo. March 18, 2005) ("Because USERRA was enacted in 1994, all claims based on the statute must be brought within four years pursuant to §1658."); Copeland v. Novartis Pharm. Corp., Novartis Nutrition Corp., No. CV-04-J-1159-S, 4 (N.D. Ala. Sept. 22, 2004) (court granted defendant's motion to dismiss USERRA claims and stated that ". . . Congress could have chosen to exclude USERRA from the reach of the catch-all limitations provision. Congress made no such exception for USERRA, and the inference can thus be made that Congress intended for §1658 to apply to USERRA claims."); Rogers v. City of San Antonio, 2003 WL 1566502, *8 (W.D. Tex. March 4, 2003) ("[T] the four-year statute of limitations created by 28 U.S.C. §1658 should apply to plaintiffs' claims under section 4311 of USERRA.").[6]

---

[6] Copies of these cases are provided for the court's convenience as Exhibits F-H.

At the latest, the statute of limitations began running on Mr. O'Neil's USERRA claims on his July 1999 termination date (and in fact would be earlier for Counts II and III, which allege violations prior to his termination). Cmplt. ¶26. Since Mr. O'Neil did not file the present action until March 11, 2005, he is well past the July 2003 deadline required by §1658. As such, Mr. O'Neil's USERRA claims – Counts I, II, and III – should be dismissed as time-barred.

A.    **Mr. O'Neil Incorrectly Asserts That Counts I Through III Are Not Subject To A Statute of Limitations.**

Notwithstanding the existence of §1658, Mr. O'Neil asserts that USERRA is not subject to a statute of limitations. Cmplt. ¶7(a).[7] It is true that USERRA does not specify a statute of limitations that applies to USERRA claims, and addresses statutes of limitations only to the extent that it prohibits the application of individual state's limitations periods to USERRA claims. 38 U.S.C. §4323(i). However, as noted in Jones v. R.R. Donnelley & Sons Co., 531 U.S. 369, 124 S.Ct. 1836, 1839 (2004), the absence of a limitations period within a statute is common among federal statutes. In fact, this is precisely why §1658 was enacted – to provide a statute of limitations that applies to Acts of Congress like USERRA that do not "otherwise provide by law" for a statute of limitations. 28 U.S.C. §1658; H. Rep. No. 101-734, at 24 (1990). Further, by disclaiming the use of state statutes of limitations, Congress made USERRA subject to 28 U.S.C. §1658. 28 U.S.C. §1658; 38 U.S.C. §4323(i); Copeland, No. CV-04-J-1159-S at 4.

---

[7] While Putnam acknowledges that the court must take a complaint's well-pled allegations as true on a motion to dismiss, the court may not credit legal conclusions. See Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir. 1993) ("Factual allegations in a complaint are assumed to be true when a court is passing upon a motion to dismiss, but this tolerance does not extend to legal conclusions . . . or to "bald assertions.") (internal citations omitted); Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). Therefore, the court need not, and in fact should not, accept Mr. O'Neil's cursory assurance that no statute of limitations exists to bar his claims.

**B.    The Only Decision Supporting Mr. O'Neil's Position That USERRA Is Not Subject To §1658 Was Wrongly Decided And Is No Longer Good Law.**

The only decision supporting Mr. O'Neil's assertion that USERRA is not subject to a limitations period is <u>Akhdary v. City of Chattanooga</u>, 2002 WL 32060140 (E.D.Tenn. May 22, 2002).[8]  <u>Akhdary</u> reasoned that, because USERRA merely "amends" the pre-1990 Veteran's Reemployment Rights Act ("VRRA"), USERRA is not a new Act of Congress and is thus not subject to §1658.  2002 WL 32060140 at *6.  However, <u>Akhdary</u> was wrongly decided and, in any event, is no longer good law in light of the Supreme Court's subsequent decision in <u>Jones</u>, <u>supra</u>.

**1.    <u>Akhdary</u> Incorrectly Held That USERRA Is An Amendment To The VRRA.**

<u>Akhdary</u> incorrectly held that USERRA is merely an amendment to the VRRA.  2002 WL 32060140 at *6.  However, as has been held explicitly, USERRA is not an amendment but is a new, stand-alone act of Congress.  This was the result reached by the federal district court in <u>Rogers</u>.  2003 WL 1566502 at *7 ("In contrast to the Civil Rights Act of 1991, USERRA was essentially a new Act.").

Indeed, the differences in the statutes strongly support this conclusion.  <u>Compare</u> 38 U.S.C. §4311(a) <u>with</u> 38 U.S.C. §4304(d) (1992).  The VRRA protected members of the military reserves only to the extent that their employers were required to grant them leaves of absence for training obligations, and to permit the employee to return to the same position with the same seniority, status, pay, and vacation as the employee would have had if the employee had not been absent for training.  38 U.S.C. §4304(d) (1992).  USERRA, on the other hand, created for the first time employer liability for denying an employee <u>any</u> benefit of employment.  38 U.S.C. §4311(a).  Furthermore, as the Supreme Court held in <u>Monroe v. Standard Oil Co.</u>, 452 U.S. 549, 559 (1981), the VRRA required a person to allege that his military service was the <u>sole</u> reason

---

[8] A copy is provided for the court's convenience at Exhibit I.

for discrimination in order to be able to state a claim. USERRA overturned <u>Monroe</u>, and by extension the VRRA, by radically reformulating USERRA's cause of action and holding employers liable where military status was one of multiple motivating factors, while at the same time affording employers a mixed-motive defense that had not previously existed. 38 U.S.C. §§4311(c)(1); <u>Rogers</u>, 2003 WL 1566502 at *8 ("Thus, through the enactment of USERRA and specifically section 4311, Congress repealed the 'sole cause' standard enunciated in <u>Monroe</u>, insisting instead on the 'motivating factor' standard.").[9] As a new Act of Congress, USERRA is subject to §1658. 28 U.S.C. §1658; <u>see</u> <u>Jones</u>, 124 S.Ct. at 1844 (assuming that new sections of the U.S. Code are subject to §1658).

> **2.    Even If <u>Akhdary</u> Had Correctly Concluded That USERRA Amended The VRRA, USERRA Is Nonetheless Subject To §1658 Under The <u>Jones</u> Analysis Because USERRA "Made Possible" Mr. O'Neil's Claims.**

Even if <u>Akhdary</u> correctly concluded that USERRA was an amendment to the VRRA, rather than a new act of Congress, USERRA is still subject to §1658. <u>See</u> <u>Jones</u>, 124 S.Ct. at 1845. In <u>Jones v. R.R. Donnelley & Sons Co.</u>, 531 U.S. 369, 124 S.Ct. 1836, 1839 (2004), the Supreme Court articulated the test for determining whether statutory amendments are "Acts of Congress" for §1658 purposes. <u>Id.</u> In so doing, <u>Jones</u> overruled <u>Akhdary</u> to the extent that <u>Akhdary</u> held that all amendments to pre-existing Acts are not subject to §1658. <u>See generally</u>, <u>id.</u>, 124 S.Ct. at 1836.[10] As a result, both district courts that have analyzed the applicability of §1658 to USERRA in light of <u>Jones</u> have held that USERRA claims are subject to §1658. <u>See</u>

---

[9] Further, the manner in which USERRA was enacted is more like the enactment of a new Act than an amendment to a pre-existing act. Rather than simply adding a new section or redefining a term in the VRRA, Congress repealed the VRRA and replaced it in its entirety with USERRA. <u>Compare</u> 38 U.S.C. §4311(a) <u>with</u> 38 U.S.C. §4304(d) (1992). Given the substantial substantive differences between USERRA and VRRA, USERRA must be considered an entirely new act of Congress. <u>See id.</u>

[10] Note that <u>Jones</u> expressly overrules the reasoning in <u>Zubi v. AT&T Corp.</u>, 219 F.3d 220 (3rd Cir. 2000), which the <u>Akhdary</u> court relied on in reaching its result. <u>Jones</u>, 124 S.Ct. at 1841; <u>Akhdary</u>, 2002 WL 32060140 at *6.

- 7 -

Quick, No. 4:04-CV-396 (CEJ) at 7 ("Because USERRA was enacted in 1994, all claims based on the statute must be brought within four years pursuant to §1658."); Copeland, No. CV-04-J-1159-S at 7 (holding USERRA claims subject to §1658 in light of Jones).

In Jones, the Supreme Court considered whether the petitioners' claims, alleging violations of their rights under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, were governed by §1658 or by a state statute of limitations. Jones, 124 S.Ct. at 1839.[11]  The Jones petitioners relied on the 1991 amendment to allege a violation of §1981. Id. at 1840. The applicability of §1658 thus depended on whether the petitioners' causes of action "arose under" the 1991 amendment or the original version of §1981. Id. at 1840. In deciding Jones, the Court resolved a circuit split as to whether an amendment to a pre-existing statute causes a new cause of action to "arise" for purposes of §1658. Id. at 1841. The Court ultimately held that a new cause of action arises when a claim against a defendant is "made possible" by a post-1990 enactment, even if that enactment is an amendment to a pre-1990 law. Id. at 1845. In Jones, petitioners' claims were made possible only by the 1991 amendment and therefore subject to the statute of limitations set forth in §1658. Id. at 1845-46.

Even if USERRA is considered an amendment to the VRRA, Jones requires the dismissal of Counts I through III, because those claims were made possible by the enactment of USERRA, with the result that they are subject to §1658. In Counts II and III, Mr. O'Neil alleges that Putnam denied him benefits of employment by denying him an opportunity to participate in training classes required for promotion, as well as a pay increase, on account of his military status. Cmplt. ¶¶42, 46. These Counts could not be asserted prior to the enactment of USERRA. Under the VRRA, members of the military reserves were protected only to the extent that their

---

[11] Unlike USERRA, 38 U.S.C. §4323(i), §1981 does not restrict the application of states' statutes of limitations. See Jones, 124 S.Ct. at 1839 (holding "that federal courts should apply 'the most appropriate or analogous state statute of limitations' to claims based on asserted violations of §1981" (quoting Goodman v. Lukens Steel Co., 482 U.S. 656, 660 (1987))).

employers were required to grant them leaves of absence for training obligations, and to permit the employee to return to the same position with the same seniority, status, pay, and vacation as he would have had if he had not been absent for training. 38 U.S.C. §4304(d) (1992). USERRA, on the other hand, created for the first time employer liability for denying an employee any benefit of employment, including training and pay increases. 38 U.S.C. §4311(a); see also Copeland, No. CV-04-J-1159-S at 6-7 (because the "VRRA did not give military reservists a cause of action for discriminatory denial of promotions or management positions", only enactment of USERRA made claim possible).

In Count I, Mr. O'Neil alleges that his military service was one motivating factor in his termination. Cmplt. ¶37. This claim could not have been asserted prior to the enactment of USERRA. Under the VRRA, plaintiffs were required to prove that their military status was the sole reason for their termination. See Monroe, 452 U.S. at 559. In contrast, USERRA requires employees to plead only that their military status is one motivating factor, rather than the sole factor, for the denial of benefits. 38 U.S.C. §4311(c)(1). Accordingly, Counts I through III were made possible only by USERRA and should be dismissed as barred by the four year statute of limitations in §1658. See, e.g., Copeland, No. CV-04-J-1159-S at 7.

For all of the above reasons, Counts I through III should be dismissed.

## II.    The Implied Contract Count Should Be Dismissed As Time-Barred By Mass. Gen. Laws ch. 260 §2.

As an action on an implied contract, Count IV is subject to Mass. Gen. Laws ch. 260 §2, which requires contract actions to be brought within six years after the cause of action accrues. Mass. Gen. Laws ch. 260, §2 ("Actions of contract . . . founded upon contracts or liabilities, express or implied, . . . shall . . . be commenced only within six years next after the cause of action accrues.") (emphasis added); Massad v. Flagg, 1994 WL 879776, **1 (Mass. Super. Ct. 1994) (the six year statute of limitations established by Mass. Gen. Laws ch. 260, §2 applies to both traditional contract claims and promissory estoppel claims) (citing New Bedford v. Lloyd Investment Assoc., Inc., 363 Mass. 112, 118 (1973)). Under Massachusetts law, actions for

breach of contract accrue at the time of the breach.  Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc., 119 F.3d 55, 64 (1st Cir. 1997) (applying Massachusetts law).

Even if Putnam promised Mr. O'Neil that it would process his U4 and transfer his licenses, Mr. O'Neil's cause of action would have accrued sometime shortly after he submitted the U4 to Putnam in October 1997 (i.e., at the time Mr. O'Neil expected the U4 to be sent to the NASD).  By failing to commence an action by October 2003, six years after the alleged breach, Mr. O'Neil is now barred by the statute of limitations set forth in Mass. Gen. Laws ch. 260 §2 and Count IV should be dismissed.

**III.    The Implied Contract Count Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted Because Mr. O'Neil's "Assumption" Does Not Form The Basis For An Implied Contract.**

In Count IV, Mr. O'Neil alleges that Putnam failed to transfer his NASD licenses and that this failure constitutes a breach of an implied contract.[12]  Cmplt. ¶¶49-50.  However, Mr. O'Neil does not allege anywhere in the Complaint that Putnam ever made an offer to him, or otherwise represented or promised that it would transfer his licenses.  Instead, he alleges that he "reasonably assumed that Putnam would complete the process of transferring the licenses" once he submitted them.[13]  Cmplt. ¶¶8(b), 49.  However, even viewed in the light most favorable to Mr. O'Neil, this allegation is insufficient to state a claim as a matter of law.  See, e.g., O'Brien v. New England Tel. & Tel. Co., 664 N.E.2d 843, 848 (Mass. 1996).

In O'Brien, the plaintiff alleged that her former employer had wrongfully terminated her

---

[12] Although unclear, Putnam assumes that Mr. O'Neil is proceeding under a theory of breach of implied contract as advanced by the Massachusetts employee handbook line of cases and not under a promissory estoppel theory. See Neuhoff v. Marvin Lumbar and Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004) (stating elements of promissory estoppel).  However, the sine qua non of promissory estoppel is a promise, which does not exist here.  See Santoni v. Federal Deposit Ins. Corp., 677 F.2d 174, 179 (1st Cir. 1982) ("The first essential element of promissory estoppel is that the promisor has made a binding offer in the form of a promise.").

[13] While Putnam is uncertain at this point in the litigation whether Mr. O'Neil ever submitted a U4, it assumes for the limited purpose of this Motion to Dismiss that he did.

implied contract of employment on the grounds that the company's employee handbook granted her contractual rights beyond those of an at-will employee. O'Brien, 664 N.E.2d at 844, 846. Acknowledging that an employee handbook can form the basis for an implied contract, the court held that:

> if an employee reasonably believed that the employer was offering to continue the employee's employment on the terms stated in the manual, the employee's continuing to work after receipt of the manual would be in the nature of an acceptance of an offer of a unilateral contract [citations omitted], and the promise would not be illusory. The fact that the employer did not intend to make such an offer, and that there was no explicitly bargained-for exchange, does not matter if employees in general would reasonably conclude that the employer was presenting the manual as a statement of conditions under which employment would continue.

Id. at 847, 848.

O'Brien is unavailing in the case at bar, however. In that case, the parties did not dispute the existence of the employee handbook, limiting the question to whether an employee could "reasonably conclude" that the promises made by the employer in the handbook were contractual and binding. Id. at 848. In order for the O'Brien analysis to apply, Mr. O'Neil must in the first instance allege the existence of a promise – in a handbook or elsewhere – before arguing that his "reasonable assumption" formed an implied contract. See id. In the absence of this essential element of an implied contract, Mr. O'Neil's claim should be dismissed for failure to state a claim upon which relief can be granted. See id.; see also Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir. 1991) (selection guidelines are an invitation to interested persons to submit applications and not promises to form a contract).

## Conclusion

For the above stated reasons, Mr. O'Neil's Complaint should be dismissed with prejudice in its entirety.

> **Putnam Retail Management Limited Partnership,**
>
> By its attorneys,
>
> *[signature]*
>
> Louis A. Rodriques, BBO #424720
> Cynthia M. Guizzetti, BBO #653858
> **BINGHAM MCCUTCHEN LLP**
> 150 Federal Street
> Boston, MA  02110-1726
> (617) 951-8000

Dated: May 10, 2005

- 12 -

Disciplinary Action for Emp

Home > Administer Workforce > Manage Labor Relations (GBL) > Use > **Disciplinary Action** New Window

| Disciplinary Action | Action Taken | Disciplinary Resolution |

**Name:**          O'Neil,David M.              Employee              **ID:** 112002

**Total Incident:** 2

**Disciplinary Action**

View All          First

| **Job Title:** Agility Trainee | **Division:** Investor Services |
| **Reports To:** | **Group:** Retirement Plans |
| | **Dept:** Retirement Plans Phones |

**\*Type:**          BEH 🔍          UNPROFSNL BEHAVIOR TO CLIENT

**\*Reported Date:**     07/10/1998 📅

**\*Group Message:**   On July 7, 1998, at the close of a conversation with an E.D. Jones broker and her client, you referred to workers as "idiots".  The broker, who was still on the line at the time, felt the remark was directed to her client.   The broker in turn brought this to the attention of Lou Gemharn a Client Service Manager at Pu broker felt the remark damaged her relationship with her client and was offended and disappointed in th she received from Putnam.

**Supervisor ID:**     106188 🔍 McMakin,William J.

**\*Purge Date:**     01/10/1999 📅

**Disciplinary Letter Information**

View All          First

**\*Letter Code:**     [    ] 🔍                    **Date Letter Printed:** [        ] 📅

[💾 Save]   [🔍 Return to Search]   [🔙 Previous tab]   [🔜 Next tab]

Disciplinary Action | Action Taken | Disciplinary Resolution

Memorandum

To:        David O'Neil

Subject:   Jeff Ryan

From:      Verbal Warning

Date:      November 2, 1998

---

This memorandum serves as a verbal warning for attendance.  This warning period will be in effect for the next 60 days and will not end until January 2, 1999.

Over the last  six months you have been absent on five separate occasions.  Listed below are the days that you have been absent.

May 27,1998
October 2,1998
October 23,1998
October 29,1998
October 30,1998

During this period and thereafter, you are expected to adhere to all Putnam policies. While you are on warning, you are not eligible for transfers, will receive no merit and will experience an extension of the period between your merit raises.

Failure to adhere to Putnam's attendance policy, as well as other Putnam policies, may lead to further disciplinary action up to and including termination.

You should feel free to discuss this matter with your Human Resource Representative.


_____                    _____
David O'Neil                          Date

cc: Amanda Rusk
cc: Liam McMakin

Home > Administer Workforce > Manage Labor Relations (GBL) > Use > Disciplinary Action  New Window

| Disciplinary Action | Action Taken | Disciplinary Resolution |

**Name:**     O'Neil,David M.                    Employee              **ID:** 112002

**Total Incident:**    2

**Disciplinary Action**
                                                                    View All        First

| **Job Title:**  Agility Trainee | **Division:**  Investor Services |
| **Reports To:** | **Group:**  Retirement Plans |
| | **Dept:**  Retirement Plans Phones |

**\*Type:**          [ATT] 🔍        ATTENDANCE/PUNCTUALITY

**\*Reported Date:**  [11/02/1998] 📅

**\*Group Message:**   Memorandum

                       To:              David O'Neil

                       Subject:    Jeff Ryan

**Supervisor ID:**   [108220] 🔍  Ryan,Jeffrey A.

**\*Purge Date:**    [05/02/1999] 📅

**Disciplinary Letter Information**
                                                                    View All        First

**\*Letter Code:**   [    ] 🔍              **Date Letter Printed:**  [    ] 📅

[💾 Save]  [🔍 Return to Search]  [◀ Previous tab]  [▶ Next tab]

Disciplinary Action | Action Taken | Disciplinary Resolution

On July 7, 1998, at the close of a conversation with an E.D. Jones broker and her client, you referred to your co-workers as "idiots". The broker, who was still on the line at the time, felt the remark was directed to her and her client.  The broker in turn brought this to the attention of Lou Gemharn a Client Service Manager at Putnam. The broker felt the remark damaged her relationship with her client and was offended and disappointed in the service she received from Putnam.

According to Putnam policy, "Rude or unprofessional behavior when dealing with customers or clients" is considered to be a major offense and in extreme cases is cause for immediate dismissal.

Due to this infraction, you are being placed on a verbal warning for 60 days ending on September 15, 1998.  While you are on warning, you are not eligible for transfer, will receive no merit raises and will experience an extension of the period between your merit raises.

During this period and thereafter, you are expected to adhere to all Putnam policies. Failure to adhere to the above stated policy or any other Putnam policy, will lead to further disciplinary action up to and including termination.

NASD | This section is part of a frameset. This page contains the main content of the fram...   **EXHIBIT C**

Case 1:05-cv-10469-PBS    Document 4    Filed 05/10/2005    Page 17 of 64



Location: NASD > Manual > Rules of the Association > Membership and Registration Rules (1000) > 1000. Membership, Registration and Qualification Requirements > 1060. Persons Exempt from Registration

‹‹ **Previous**                                                                                            **Next** ››

## 1060. Persons Exempt from Registration

(a) The following persons associated with a member are not required to be registered with the Association:



NASD Notices to Members
(1 link)

(1) persons associated with a member whose functions are solely and exclusively clerical or ministerial;

(2) persons associated with a member who are not actively engaged in the investment banking or securities business;

(3) persons associated with a member whose functions are related solely and exclusively to the member's need for nominal corporate officers or for capital participation; and

(4) persons associated with a member whose functions are related solely and exclusively to:

(A) effecting transactions on the floor of a national securities exchange and who are registered as floor members with such exchange;

(B) transactions in municipal securities;

(C) transactions in commodities; or

(D) transactions in security futures, provided that any such person is registered with a registered futures association.

(b) Member firms, and persons associated with a member, may pay to nonregistered foreign persons transaction-related compensation based upon the business of customers they direct to member firms if the following conditions are met:

(1) the member firm has assured itself that the nonregistered foreign person who will receive the compensation (the "finder") is not required to register in the U.S. as a broker/dealer nor is subject to a disqualification as defined in Article III, Section 4 of the Association's By-Laws, and has further assured itself that the compensation arrangement does not violate applicable foreign law;

(2) the finders are foreign nationals (not U.S. citizens) or foreign entities domiciled abroad;

(3) the customers are foreign nationals (not U.S. citizens) or foreign entities domiciled abroad transacting business in either foreign or U.S. securities;

(4) customers receive a descriptive document, similar to that required by Rule 206(4)-3(b) of the Investment Advisers Act of 1940, that discloses what compensation is being paid to finders;

(5) customers provide written acknowledgment to the member firm of the existence of the compensation arrangement and that such acknowledgment is retained and made available for inspection by the Association;

(6) records reflecting payments to finders are maintained on the member firm's books and actual agreements between the member firm and persons compensated are available for inspection by the Association; and

(7) the confirmation of each transaction indicates that a referral or finders fee is being paid pursuant to an agreement.

Case 1:05-cv-10469-PBS    Document 4    Filed 05/10/2005    Page 18 of 64

Amended by SR-NASD-2002-40 eff. Oct. 15, 2002.
Amended by SR-NASD-98-86 eff. Nov. 19, 1998.
Amended by SR-NASD-95-39 eff. Aug. 20, 1996.
Amended by SR-NASD-94-51 eff. Feb. 15, 1995.
Amended by SR-NASD-88-12 eff. Nov. 2, 1988.
Amended by SR-NASD-80-01 eff. June 26, 1980.

**Selected Notice to Members:** 95-37.

<< **Previous**                                                                 **Next** >>

© 2005 NASD. All rights reserved.

NASD | This section is part of a frameset. This page contains the main content of the fram... **EXHIBIT D**

Case 1:05-cv-10469-PBS    Document 4    Filed 05/10/2005    Page 19 of 64



Location: NASD > Manual > Rules of the Association > Membership and Registration Rules (1000) > 1000. Membership, Registration and Qualification Requirements > 1030. Registration of Representatives > 1031. Registration Requirements

<< Previous                                                                                                    Next >>

## 1031. Registration Requirements

### (a) All Representatives Must Be Registered

All persons engaged or to be engaged in the investment banking or securities business of a member who are to function as representatives shall be registered as such with NASD in the category of registration appropriate to the function to be performed as specified in Rule 1032. Before their registration can become effective, they shall pass a Qualification Examination for Representatives appropriate to the category of registration as specified by the Board of Governors. A member shall not maintain a representative registration with NASD for any person (1) who is no longer active in the member's investment banking or securities business, (2) who is no longer functioning as a representative, or (3) where the sole purpose is to avoid the examination requirement prescribed in paragraph (c). A member shall not make application for the registration of any person as representative where there is no intent to employ such person in the member's investment banking or securities business. A member may, however, maintain or make application for the registration as a representative of a person who performs legal, compliance, internal audit, back-office operations, or similar responsibilities for the member, or a person who performs administrative support functions for registered personnel, or a person engaged in the investment banking or securities business of a foreign securities affiliate or subsidiary of the member.

### (b) Definition of Representative

Persons associated with a member, including assistant officers other than principals, who are engaged in the investment banking or securities business for the member including the functions of supervision, solicitation or conduct of business in securities or who are engaged in the training of persons associated with a member for any of these functions are designated as representatives.

### (c) Requirement for Examination on Lapse of Registration

Any person whose registration has been revoked pursuant to Rule 8310 or whose most recent registration as a representative or principal has been terminated for a period of two (2) or more years immediately preceding the date of receipt by the Association of a new application shall be required to pass a Qualification Examination for Representatives appropriate to the category of registration as specified in Rule 1032.

***Cross Reference–***

*IM-8310-1, Effect of Suspension, Revocation, or Bar*

Amended by SR-NASD-2003-24 eff. March 3, 2003.
Amended by SR-NASD-89-53 eff. Aug. 28, 1990.
Amended by SR-NASD-89-15 eff. June 8, 1989.
Amended by SR-NASD-80-01 eff. June 26, 1980.

<< Previous                                                                                                    Next >>

© 2005 NASD. All rights reserved.



&#x2039;&#x2039; **Previous**                                                                          **Next** &#x203A;&#x203A;

## 1041. Registration Requirements for Assistant Representatives

### (a) All Assistant Representatives — Order Processing Must Be Registered

| NASD Notices to Members (1 link) ▼ |
|---|

All persons associated with a member who are to function as Assistant Representatives — Order Processing shall be registered with the Association. Before their registrations can become effective, they shall pass a Qualification Examination for Assistant Representatives — Order Processing as specified by the Board of Governors.

### (b) Definition of Assistant Representative — Order Processing

Persons associated with a member who accept unsolicited customer orders for submission for execution by the member are designated as Assistant Representatives — Order Processing.

### (c) Requirement for Examination on Lapse of Registration

Any persons whose most recent registration as an Assistant Representative — Order Processing has been terminated for a period of two (2) or more years immediately preceding the date of receipt by the Association of a new application shall be required to pass a Qualification Examination for Assistant Representative — Order Processing.

---
Amended by SR-NASD-2002-110 eff. Dec. 2, 2002.
Amended by SR-NASD-88-26 eff. June 12, 1989.

**Selected Notice to Members:** 02-77.
---

&#x2039;&#x2039; **Previous**                                                                          **Next** &#x203A;&#x203A;

© 2005 NASD. All rights reserved.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES J. QUICK, et al.,          )
                                 )
                                 )
            Plaintiffs,          )
                                 )
                 vs.             )    No. 4:04-CV-396 (CEJ)
                                 )
DELUXE CORPORATION,              )
                                 )
            Defendant.           )

**JUDGMENT**

In accordance with the Memorandum and Order entered this same date,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that judgment is entered in favor of defendant Deluxe Corporation and against plaintiffs James J. Quick, John F. Gilbert and John T. Brown. The plaintiffs shall bear the costs.


                                   _____
                                   CAROL E. JACKSON
                                   UNITED STATES DISTRICT JUDGE


Dated this 18th day of March, 2005.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES J. QUICK, et al.,              )
                                     )
                                     )
            Plaintiffs,              )
                                     )
      vs.                            )        No. 4:04-CV-396 (CEJ)
                                     )
DELUXE CORPORATION,                  )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court upon the motion of defendant Deluxe Corporation to dismiss or, in the alternative, for summary judgment.  Plaintiffs oppose the motion, and the issues have been fully briefed.

Defendant Deluxe Corporation, Inc. ("Deluxe") is a Minnesota corporation in the business of printing checks.  At the time of the events and allegations arising in this suit, defendant was doing business as Deluxe Check Printers, Inc.  Plaintiffs John F. Gilbert, John T. Brown, and James J. Quick began working for the defendant at its Maryland Heights, Missouri plant in 1964, 1965, and 1970, respectively.  Gilbert, Brown, and Quick are veterans who entered active military service during their employment with defendant and were re-employed after being honorably discharged in 1969, 1969, and 1973, respectively.  Each plaintiff continued to work at Deluxe until the company began worker lay-offs in 1997.  Plaintiffs allege that the defendant failed to recognize their active military service as qualifying employment for credit and contribution to their accounts in Deluxe's pension plan.  They

bring suit pursuant to the Uniformed Services Employment and Re-employment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-03, the Veterans' Re-employment Rights Act ("VRRA"), formerly codified at 38 U.S.C. §§ 2021-26, and the Military Selective Service Act of 1967 ("MSSA"), formerly codified at 50 U.S.C. App. § 459. Defendant moves for summary judgment, arguing that plaintiffs' USERRA claims are time-barred and that the Plan is a short-term compensation plan to which VRRA and MSSA do not apply.

I.  **Background**

In 1943, Deluxe initiated a defined contribution plan, the Profit Sharing Trust Agreement ("Plan"), as a method of helping its employees prepare for a secure retirement. In 1963, the defendant restated the Plan, having incorporated ten amendments to the 1943 document into a booklet for employees. Since the 1963 restatement, nine amendments have been made to the document.

Under the Plan, as codified in 1963, Deluxe makes contributions to the Plan only for years in which it makes a profit. Employees do not pay money into the trust. However, each employee's share of the trust is determined based on his or her yearly earnings. The Plan provides that participants are to receive one unit for each one hundred dollars of yearly earnings. The participants also receive one unit for each year of employment with Deluxe.

Employees become eligible to share in the trust after completing two years of employment and attaining the age of twenty. Employees who are sixty-five years old and older cease to receive

a share in the trust.    Participants in the trust may begin receiving distributions upon retirement, resignation, or death, and in certain special circumstances, such as the purchase of a home. Plan contributions completely vest and participants are entitled to their entire benefit upon the occurrence of death, retirement, disability, or termination for reasons in which the participant is not responsible.    A progressive vesting program is used to establish the amount of distribution given to employees who resign. A 1969 amendment to the Plan provides for a participant's account to vest at sixty percent with two or fewer years of service, and at 100 percent with five or more years of service.

Plaintiff Quick began employment with the defendant on October 6, 1970, at age nineteen.    He became twenty years old on January 23, 1971, and entered military service on October 1, 1971.    Quick was honorably discharged from military service on May 18, 1973, and was re-employed by Deluxe one week later on May 25, 1973.    Deluxe also enrolled Quick into the Plan on May 25, 1973.    He received a share of Deluxe's contribution to the Plan for the year ending December 31, 1973.

On June 22, 1964, plaintiff Gilbert, then age seventeen, began employment with defendant.    He entered military service on July 15, 1965.    He became age twenty on January 21, 1967.    Gilbert was honorably discharged from military service on July 14, 1969, and was re-employed by Deluxe two days later on July 16, 1969.    He received a share of Deluxe's contribution to the Plan for the year ending December 31, 1969.

-3-

Plaintiff Brown began employment with defendant on May 26, 1965, at age nineteen. He became age twenty on February 28, 1966, and entered military service on March 11, 1966. Brown was honorably discharged from the service on November 28, 1969, and was re-employed by Deluxe less than a week later on December 4, 1969. He received a share of Deluxe's contribution to the Plan for the year 1969.

In 1997, defendant began worker layoffs at its Maryland Heights location. Plaintiffs were laid off and began receiving distributions from the Plan that same year. At that time, they realized that defendant had not credited their profit sharing accounts in the Plan for the time they spent in active military service. Also in 1997, each plaintiff contacted the U.S. Department of Labor for assistance in determining his contribution rights under the Plan. The Department of Labor referred each plaintiff's case to the office of the United States Attorney General for consideration of legal action. Plaintiffs filed this suit on April 2, 2004, seeking relief under USERRA. Defendant then filed a motion to dismiss the USERRA claims. Subsequently, plaintiffs' filed a motion for, and were granted, leave of court to amend their complaint to include statutory claims under the VRRA and MSSA.

## II.  **Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 317, 322 (1986).

III. **Discussion**

A. **USERRA Claims**

Plaintiffs claim that defendant violated USERRA because Deluxe did not recognize their military service as qualifying employment for purposes of contribution and credit in the Plan. Defendant argues that USERRA does not apply retroactively and that plaintiffs' USERRA claims are time barred.

In 1994, Congress enacted USERRA as an amendment to the VRRA. The VRRA, contains an explicit ban on state statute of limitations. 38 U.S.C. § 2022 (1976). USERRA repeats the ban on state statute of limitations. See 38 U.S.C. § 4323(i). The parties argue as to whether USERRA is subject to the four-year statute of limitations set out in 28 U.S.C. § 1658,[1] which applies to civil actions

---

[1]"Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of

arising under an Act of Congress. Congress passed § 1658 in 1990, before USERRA was enacted and after the VRRA and MSSA were in effect.

Defendant Deluxe argues that USERRA is subject to § 1658 and, thus, plaintiffs' USERRA claims are untimely. Deluxe argues that plaintiffs were laid off in 1997, began to receive distributions from the Plan in 1997, and have been aware of their claims since 1997. According to the defendant, plaintiffs' suit is untimely because it was not brought until 2004, after the four-year limitations period under § 1658 expired.

Plaintiffs argue that § 1658 was enacted for entirely new federal causes of action that do not have their own statutes of limitations and, thus, are not applicable to USERRA. They argue that USERRA preserves the limitations set out in the VRRA. They further argue that the language and structure of USERRA require that there be no statute of limitations and that USERRA is only subject to the equitable defense of laches.

The Supreme Court recently addressed the applicability of § 1658 to post-1990 congressional enactments. In Jones v. R.R. Donnelley & Sons Co., 124 S.Ct. 1836, 1844 (2004), the Supreme Court stated, "Nothing in the text or history of § 1658 supports an interpretation that would limit its reach to entirely new sections of the United States Code. An amendment to an existing statute is no less an 'Act of Congress' than a new, stand-alone statute." The

---

enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a).

-6-

Supreme Court also stated that § 1658 governs a cause of action "if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." Id. Therefore, in the instant case, it is irrelevant that USERRA is an amendment to the VRRA and not an entirely new cause of action. Because USERRA was enacted in 1994, all claims based on the statute must be brought within four years pursuant to § 1658.

At the latest, plaintiffs' cause of action accrued in 1997, but they did not file this suit until 2004, more than four years later. Because the four-year statute of limitations found in § 1658 has expired, there are no genuine issues of material fact as to plaintiffs' USERRA claims. The USERRA claims are time-barred. Therefore, this Court finds it unnecessary to address defendant's argument that USERRA is not retroactive.

After briefing of this matter was completed, plaintiffs filed a supplemental memorandum citing a proposed rulemaking by the Department of Labor concerning USERRA regulations. In the proposal, the Department states that it takes the position that no statute of limitations, state or federal, applies to USERRA. Veterans' Employment and Training Service, 69 Fed. Reg. 56266, 56281 (Sept. 20, 2004). The Department further states that the USERRA cause of action predates § 1658 because it existed under the VRRA. It is the Department's position that the Supreme Court's decision in Jones does not apply to USERRA "because USERRA 'otherwise provides by law' that no statue of limitations applies." Id. The Department has not promulgated a final regulation.

-7-

Defendant, without argument, responded with a supplemental citation to a Fifth Circuit decision concerning deference paid to proposed rulemakings. The opinion stated that "proposed regulations are not entitled to judicial deference and carry no more weight than a position advanced in a brief by one of the parties." In the Matter of Appletree Markets, Inc., 19 F.3d 969, 973 (5th Cir. 1994). The Fifth Circuit also stated that other circuits share in its view: "[T]he Tenth Circuit noted that '[u]ntil the agency completes formal rule-making and promulgates final regulations, the proposed rules . . . are unpersuasive.' . . . [T]he Fourth Circuit refused to consider their effect noting that the regulations are not in effect and we do not know when, if ever, they will become effective." Id. (quoting Oakley v. City of Longmont, 890 F.2d 1128, 1133 (10th Cir. 1989), cert. denied, 494 U.S. 1082 (1990); Telvest Inc. v. Bradshaw, 618 F.2d 1029, 1036 n.10 (4th Cir. 1980)).

This Court agrees with the Fifth Circuit's view that proposed regulations are not entitled to judicial deference. Accordingly, the Court will grant defendant's motion for summary judgment as to the USERRA claims.

**B. VRRA and MSSA Claims**

The MSSA was enacted in 1967. It renamed and amended the Universal Military Training Selective Service Act. In 1974, Congress enacted the Vietnam Era Veterans Readjustment Assistance Act of 1974, which is also known as the Veterans Reemployment Rights Act. The VRRA repealed the MSSA and recodified the MSSA's

provisions.  Throughout this period of name changes, amendments, and repeals, the statutory language relevant to this case has largely remained the same.  In 1994, Congress enacted USERRA, which amended and repealed the VRRA.  USERRA is not applicable to the instant case for reasons discussed above.  The citations in this section of the memorandum are to the VRRA as formerly codified in 38 U.S.C. §§ 2021 et seq.

After defendant moved to dismiss plaintiffs' USERRA claims, plaintiffs requested leave to amend the complaint to include VRRA and MSSA as additional statutory bases for their claims.  Unlike USERRA, the VRRA and MSSA do not have a statute of limitations. Both the VRRA and MSSA prohibit state statutes of limitations, and neither contains its own limitations period.  Further, no statute imposing a general limitations period, such as § 1658, existed at the time VRRA and MSSA were enacted.  See 38 U.S.C. § 2022 (stating that state statutes of limitations do not apply).  Thus, plaintiffs' VRRA and MSSA claims are not time-barred by statutory limitations.

At issue under plaintiffs' pre-USERRA claims is whether the Plan benefits are a "right of seniority secured to a veteran by [MSSA] § 9." Alabama Power Co. v. Davis, 431 U.S. 581, 589 (1977). If the benefits are a right of seniority, then the Plan is subject to the VRRA and the MSSA, and the defendant will be required to make contributions to the plaintiffs' Plan accounts for their time spent in military service.  The Supreme Court has developed a test to determine whether benefits accrue due to seniority:

-9-

> If the benefit would have accrued, with reasonable certainty, had the veteran been continuously employed by the private employer, and if it is in the nature of a reward for length of service, it is a "perquisite of seniority." If, on the other hand, the veteran's right to the benefit at the time he entered the military was subject to a significant contingency, or if the benefit is in the nature of short-term compensation for services rendered, it is not an aspect of seniority within the coverage of § 9.

Id.

Defendant argues that the Plan is a defined contribution plan based on short-term compensation for services and, thus, not covered by the VRRA or MSSA. Plaintiffs concede that the Plan is a defined contribution plan, but they argue that their benefits would have accrued, with reasonable certainty, had they not been on active military duty. They argue that the Plan meets the Alabama Power test, and benefits under the Plan are "perquisite[s] of seniority."

In Raypole v. Chemi-Trol Chemical Co., Inc., 754 F.2d 169, 176 (6th Cir. 1985), the Sixth Circuit applied the Alabama Power test and concluded that Chemi-Trol's profit sharing plan was in the nature of short-term compensation for work performed and the plaintiffs' contribution rights were subject to significant contingencies. Thus, the Sixth Circuit held that the VRRA did not apply to Chemi-Trol's retirement plan.

There, Chemi-Trol established separate trust fund accounts for each participant and made contributions to the plan based on net profits. Id. at 170. Its employees became eligible for the plan after one year of employment. After that, participants in Chemi-Trol's plan only shared in contributions if they completed 1,000

-10-

hours of service during the plan year. Id. Chemi-Trol distributed plan proceeds upon an employee's retirement, disability, death, or termination for reason other than retirement. The plan provided for the immediate availability of all contributions to an employee who died or became disabled, regardless of length of service. Id. at 173. Additionally, Chemi-Trol re-employed the Raypole plaintiffs upon their return from active military service. Id. at 171. It also restored the plaintiffs' seniority and pay levels based on their time in the military, but it did not make contributions to the plaintiffs' trust accounts during their military absence. Id.

In determining that the Raypole plan was in the nature of short-term compensation for services, the Sixth Circuit stated that the "predominant feature of profit sharing plans generally is that they are intended to be an incentive for productivity." Id. at 172. It further stated, "[Profit sharing] plans are directly related to work performed as reflected in salary, rather than period of employment." Id. (quoting The Supreme Court, 1965 Term, 80 Harv. L. Rev. 91, 149 (1966-67)). The fact that three of the four Chemi-Trol plan benefits, death, disability, and retirement, had no length of service requirement "refute[d] a finding that the Plan represents a perquisite of seniority." Id. at 174. This is especially so because "the Plan provided for the crediting of military service time toward the vesting of the termination benefit." Id.

-11-

The Sixth Circuit rejected the Raypole plaintiffs' argument that the Chemi-Trol's one-year eligibility requirement and the vesting of termination benefits over years of service indicates that the plan payments were based on seniority. Id. at 175. The court stated that the Chemi-Trol plan undeniably had some length of service requirements, mainly for employment security purposes. However, it added that when viewed as a whole the plan was in the nature of a short-term compensation rather than a reward for longevity of service. Id.

The instant case is similar to Raypole because Chemi-Trol and Deluxe have several commonalities. As in Raypole, Deluxe re-employed the plaintiffs upon their return from military service and restored them to their seniority and pay levels based on their time in the military. Also, as in Raypole, Deluxe did not credit the plaintiffs' profit sharing accounts for their time spent in active military service. The Chemi-Trol and Deluxe plans are similar. Like Chemi-Trol, there is no longevity requirement for receiving death, disability, or retirement benefits under the Deluxe Plan. Length of service is relevant to determine the vesting of Plan benefits when a Deluxe employee resigns or is terminated for cause. Additionally, the Deluxe Plan states that the two-year grace period for eligibility in the Plan is to assure that a person intends to be a permanent Deluxe employee. Thus, it can be said that Deluxe's length of service requirements are mainly for employment security. Like the Chemi-Trol plan, when the Deluxe Plan is viewed as a

whole, its true nature is in the form of short-term compensation for service rather than a longevity reward.

Plaintiffs rely on United States ex rel. Reilly v. New England Teamster and Trucking Industry Pension Fund, 737 F.2d 1274 (2d Cir. 1984), as support for their argument that benefits in a defined contribution plan can be "perquisites of seniority." However, the instant case is distinguishable. In New England Teamsters, the pension plan was labeled as a defined contribution plan, but the court found that it operated more like a defined benefits plan because it provided precise benefit levels. Id. at 1282, n.4. Additionally, under the New England Teamsters pension plan, fifteen years of employment was required before an employee was entitled to benefits. The Second Circuit stated, "As compensation, this is surely not short-term; and if the employee is employed by contributing employers for only fourteen years, it is not compensation, for it is never received." Id. at 1280-81. The Deluxe Plan is distinguishable from the plan in New England Teamsters because there is no length of service requirement for receiving distributions under the Plan once an employee has become a Plan participant. An employee's entitlement to benefits under the Deluxe Plan is not based upon longevity.

In addition to crediting participants' accounts in proportion to their yearly earnings, Deluxe's Plan also credited participants one unit for each year of company employment. Even if the unit is a reward for longevity, when the Plan is viewed as a whole it is in the nature of short-term compensation for services performed.

-13-

This Court finds that the benefits under the defendant's Plan are not "in the nature of a reward for length of service." Thus, they are not "perquisites of seniority." Further, the benefits of the Plan are "in the nature of short-term compensation for services rendered." Therefore, the VRRA and MSSA do not apply to the Deluxe profit sharing plan. No genuine issues of material fact exist.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment, [#8] is **granted**.

A separate judgment in accordance with this memorandum and order shall be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 18th day of March, 2005.

-14-

**EXHIBIT G**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL S. COPELAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NUMBER** |
| | ) | **CV-04-J-1159-S** |
| **NOVARTIS PHARMACEUTICALS** | ) | |
| **CORPORATION, NOVARTIS** | ) | |
| **NUTRITION CORPORATION** | ) | |
| | ) | **ENTERED** |
| **Defendants.** | ) | SEP 2 2 2004 |

## MEMORANDUM OPINION

Currently pending before the court is defendant Novartis Nutrition

Corporation's motion to dismiss Count One of the plaintiff's complaint (doc. 9),

and memorandum and evidence in support thereof. The court has reviewed all of

the pleadings and briefs submitted to date.

### I. Factual Background

On June 7, 2004, plaintiff Darryl Copeland filed claims against both

Novartis Nutrition Corporation ("Nutrition") and Novartis Pharmaceuticals

Corporation ("Pharmaceuticals") under the Uniformed Services Employment and

Re-employment Rights Act ("USERRA"). Complaint ¶¶ 5-25. The complaint

states that the plaintiff was employed by Nutrition from approximately May 1,

1992, until May 14, 2000, and he was subsequently employed by Pharmaceuticals

27

from May 14, 2000, until the time the complaint was filed on June 7, 2004.[1]
Complaint ¶ 2. The plaintiff alleges that Nutrition denied him promotions and
managerial positions because of his military commitments. Complaint ¶¶ 9, 10.
Throughout his tenure with Nutrition, the plaintiff was either an active or inactive
member of the U.S. Air Force Reserves or Air National Guard. Complaint ¶ 8.

Nutrition has moved to dismiss Count One of the plaintiff's complaint on the
grounds that the applicable statute of limitations expired prior to the filing of the
action. Defendant's brief at 1.

## II. Standard for Evaluation a Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is
properly granted when the movant establishes "beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle him to relief."
*Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir.
2004), quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In evaluating the
motion, the court must resolve all factual disputes in favor of the plaintiff.
*Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

## III. Legal Analysis

The plaintiff's claims against Nutrition arise under USERRA, which "is one

---

[1]Plaintiff's Response to Defendant Novartis Nutrition Corporation's Motion to Dismiss
stipulates that the plaintiff was terminated by Pharmaceuticals on August 13, 2004.

of a series of statutes enacted over the last half century (at least since the 1940's) to protect the employment and reemployment rights of persons serving in the military." *Rogers v. San Antonio*, No. Civ.A. SA-99-CA-1110, 2003 WL 1566502 at *6 (W.D. Tex. Mar. 24, 2003). USERRA's immediate statutory predecessor is the Vietnam Era Veterans' Readjustment Assurance Act, which was enacted in 1974. The employment provisions of this act are commonly known as the Veterans' Reemployment Rights Act ("VRRA") and were codified at 38 U.S.C. §§ 2021-27.

In the early 1990s, Congress charged the Veterans' Affairs Committee with revising VRRA, and the committee identified the "primary goals" of the new legislation as "to clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions. H.R. REP. NO. 103-65(I) (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2451. USERRA was enacted in 1994 to replace VRRA and is codified at 38 U.S.C.A. §§ 4301-33. The plaintiff's claims, which are based on his being denied managerial positions and promotions, arise under 38 U.S.C.A. § 4311.

In 1990, prior to the enactment of USERRA, Congress implemented a federal catchall limitations provision, which is codified at 28 U.S.C. § 1658. This statute provides that "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years

after the cause of action accrues." 28 U.S.C. § 1658. The single issue to be resolved in ruling upon Nutrition's motion to dismiss is whether the statute under which the plaintiff's claims against Nutrition arise is subject to the four year federal catchall statute of limitations.

USERRA explicitly supercedes any "*State law . . . that reduces, limits, or eliminates in any manner any right or benefit provided*" by the Act. 38 U.S.C.A. § 4302(b) (emphasis added). The statute also provides that "[n]o *State* statute of limitations shall apply to any proceeding" under USERRA. 38 U.S.C.A. § 4323(i) (emphasis added). However, the statute does not expressly forbid the application of *federal* statutes of limitation (or other federal laws limiting rights conferred by the Act) to USERRA claims. Considering that USERRA was enacted almost four years after § 1658, Congress could have chosen to exclude USERRA from the reach of the catch-all limitations provision. Congress made no such exception for USERRA, and the inference can thus be made that Congress intended for § 1658 to apply to USERRA claims.

The plaintiff contends that USERRA is simply a "revision" of VRRA. Plaintiff's brief at 5. The court accepts as true the plaintiff's contention that USERRA is not a stand-alone statute but is actually an amendment to a preexisting statute. The United States Supreme Court recently addressed the issue of whether § 1658 applies to amended federal statutes in *Jones v. R.R. Donnelley & Sons Co.*,

124 S. Ct. 1836 (2004).  In *Jones*, the plaintiff brought claims under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.  The Court's analysis focused on the substance and context of both the 1991 amendments and the plaintiff's claims.  *Id.* at 1839-40.  The Court noted that the 1991 amendments were a response to a narrow interpretation of the original statute by the Court; the amendments expanded the scope of the statute.  *Id.*

Before determining whether the plaintiff's claim was barred by § 1658, the *Jones* Court had to resolve the circuit split concerning whether claims brought under amendments to existing statutes are subject to the federal catchall limitations provision.  *Id.* at 1841.  The Court stated that the history of § 1658 supports a more expansive application of the statute.  *Id.* at 1844.  The Court noted that "Congress routinely creates new rights of action by amending existing statutes" and stated that "[a]n amendment to an existing statute is no less an 'Act of Congress' than a new, stand-alone statute."  *Id.*

Whether an amendment is subject to § 1658 depends upon whether the amendment creates a new cause of action.  *Id.* at 1845.  The *Jones* Court stated that determination of whether § 1658 applied to the plaintiff's claims depended upon whether the claims arose under the 1991 amendments or the original act.  *Id.* at 1840.  The Court held that any Act of Congress enacted after December 1, 1990, is subject to the four year limitations period of § 1658 so long as the plaintiff's cause

of action "was made possible by a post-1990 enactment." *Id.* at 1845. Because the plaintiff's claim was made possible by the 1991 amendments, the § 1658 limitations period applied. *Id.*

In light of *Jones*, the applicability of § 1658 to the plaintiff's claims against Nutrition depends upon whether the claims arise under a new cause of action created by USERRA. The plaintiff claims that Nutrition discriminated against him because of his military obligations by denying him management positions and promotions. The plaintiff's claims are based on the defendant's alleged violation of 38 U.S.C.A. § 4311(a), a provision of USERRA which prohibits employers from denying employees with military obligations "promotion, or any benefit of employment by an employer on the basis of" the employee's military obligations.

VRRA does not offer a comparable cause of action. Under VRRA, military reservists called to training for active or inactive duty were protected only insofar as (1) employers were required to grant requests for leave of absence to fulfill training obligations, and (2) employees were guaranteed a position of comparable seniority, status, pay, and vacation upon returning from training. 38 U.S.C. § 2024(d) (1974). VRRA did not give military reservists a cause of action for discriminatory denial of promotions or management positions.

The legislative history behind USERRA stipulates that one of the goals of the legislation was to strengthen the employment and re-employment rights of

veterans. H.R. REP. NO. 103-65(I) (1993), 1994 U.S.C.C.A.N. 2449, 2451. The language of 38 U.S.C.A. § 4311(a), specifying that employees are not to be denied promotions or any other benefits of employment because of military obligations, is a prime example of how USERRA expanded the protection previously afforded to veterans under VRRA. Because the plaintiff's claim is based upon a cause of action created by USERRA, the Supreme Court's holding in *Jones* dictates that the plaintiff's claims are subject to § 1658.

The court also accepts as true the plaintiff's contention that Nutrition and Pharmaceuticals are either a single entity or joint employer. However, this issue is irrelevant to Nutrition's motion to dismiss. Given the applicability of § 1658, any claims arising more than four years prior to the filing of the complaint are time barred. Because the plaintiff left the employ of Nutrition more than four years before filing the complaint, claims arising during the plaintiff's employment with Nutrition are barred. Only the claims against Pharmaceuticals are properly before the court.

### IV. Conclusion

After considering all issues of material fact in the light most favorable to the plaintiff, the court finds that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The plaintiff's claims against Nutrition arise under 38 U.S.C.A. § 4311, which is subject to the four year catchall

7

limitations period in 28 U.S.C. § 1658.  More than four years lapsed between the

conclusion of the plaintiff's employment with Nutrition and the filing of this

complaint.  Accordingly, the plaintiff's claims against Nutrition are time barred.

The Court therefore **GRANTS** the defendant's motion to dismiss.

      **DONE** and **ORDERED** this the _22_ day of September, 2004.


                           INGE P. JOHNSON
                           UNITED STATES DISTRICT JUDGE

Westlaw.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

Page 1

**Motions, Pleadings and Filings**

United States District Court,
W.D. Texas, San Antonio Division.
Anthony ROGERS, Richard Morales, Ventura
Calderon, Jr., Robert J. Deleon,
Rolando Cesar Garza, Robert A. Gearhart, Isidro
Medina, Jr., Timothy L.
Menchaca, Emilio M. Montes, Bruce R. Moore,
Nathaniel Oakman, Mark James Olson,
Antonio Rivas, Jeffery J. Zavala, and George W.
Randall, Plaintiffs,
v.
CITY OF SAN ANTONIO, TEXAS, Defendant.
**No. Civ.A. SA-99-CA-1110.**

March 4, 2003.

*ORDER CONCERNING CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT ON THE
ISSUE OF
LIMITATIONS*

NOWAK, Magistrate J.

*I. Introduction*

**\*1** With the liability question in this employment
discrimination case decided in favor of the plaintiffs
(*see* Docket Entry 71), the litigation moves to its
next phase, that is, a determination of the damages
to which plaintiffs are entitled under the Uniform
Services Employment and Reemployment Rights
Act of 1994 ("USERRA"), 38 U.S.C. § 4301, *et seq.*
However, before damages can be calculated the
Court must first determine the period of time,
pre-filing, during which damages accumulated and
are recoverable under the Act. USERRA does not
provide an express statute of limitations governing
civil actions, such as this one, brought under the
Act. 38 U.S.C. § 4323. The parties briefed this issue
through cross-motions for partial summary

judgment. [FN1] They also consented to my
jurisdiction pursuant to 28 U.S.C. § 636(c) for the
*limited* purpose of ruling on this legal issue. [FN2]

FN1. Docket Entries 79 and 80.

FN2. Docket Entry 76.

After having considered the arguments of the
parties, the applicable law and the record as a
whole, I hereby hold that the four-year federal
residual statute, as codified in 28 U.S.C. § 1658, is
applicable to the claims for damages presented here.

Accordingly, I hereby *GRANT* plaintiffs' request
for partial summary judgment and find that
plaintiffs are entitled to claim damages for the four
years preceding the filing of their suit, that is, from
October 4, 1995, through the date of judgment. I
further hold that the doctrines of laches and
estoppel, as asserted in this case, do not bar
plaintiffs' claims for relief. The City's motion for
partial summary judgment is, *GRANTED, IN PART,
only* to the extent it alternatively argues in support
of applying section 1658 to the case. In all other
respects, the City's motion is *DENIED.*

*II. Statement of The Case*
This is a discrimination action filed on October 4,
1999 by a group of non-career military reservists
against their employer, the City of San Antonio
("the City"). The suit is brought pursuant to the
provisions of USERRA. [FN3] Specifically,
plaintiffs, who are employed as firefighters and
EMS personnel, claim the City's practice of
excluding military leave from the twenty-seven hour
cap imposed on lost overtime unlawfully
discriminates against them because of their military
status. Other employment practices being
challenged in this case include "bonus day" leave,
"perfect attendance" leave, as well as unscheduled
overtime compensation and upgrading
opportunities. [FN4] Plaintiffs argue the City, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

implementing these employment practices, unlawfully discriminates against them by deeming them "absent" from work whenever they are on leave fulfilling their military reserve duties, as opposed to viewing them as "constructively present at work." [FN5] Plaintiffs contend the City's practices have resulted in disparate treatment discrimination on the basis of their military reserve status. Through the filing of this lawsuit, plaintiffs seek declaratory and injunctive relief, as well as reimbursement for lost wages or back pay and other benefits of employment they were denied as a result of the City's discriminatory practices. Further, plaintiffs maintain that because the City's failure to comply with the provisions of USERRA were willful, they are also entitled to an award of liquidated damages. [FN6]

FN3. 38 U.S.C. §§ 4311 and 4323.

FN4. Docket Entry 49, Plaintiffs' Third Amended Complaint.

FN5. *Id.*

FN6. *Id.* at 9-10. *See* 38 U.S.C. § 4323.

**\*2** The material facts of this case are largely undisputed. [FN7] It is for this reason the parties agreed early in the case to bifurcation, to allow the court to first consider the issue of liability under USERRA, before addressing the issue of damages. The issue of liability under USERRA was presented in the form of cross-motions for partial summary judgment. [FN8] On March 28, 2002, the Court (by the Honorable Orlando Garcia) granted plaintiffs' partial motion for summary judgment, finding that the plaintiffs met their burden of establishing that their military service was *a motivating factor* in the application of the challenged City's employment practices and policies. The Court concluded that: "[w]hile the City has argued that it has not intentionally or purposefully singled out those employees who have military reserve duty such as the plaintiffs, the enactment and application of its policies and procedures concerning the employment benefits at issue in this case, does violate the rights afforded to these individuals under USERRA."

[FN9] In finding that the City had failed to meet its burden of showing that it would have taken the same actions, regardless of the plaintiffs' military reserve obligations, the Court denied the City's cross-motion for partial summary judgment, allowing the damages portion of the case to proceed to a bench trial . [FN10]

FN7. Docket Entry 61, the parties' amended joint-stipulated facts.

FN8. Docket Entries 56 & 60.

FN9. Docket Entry 71, at 3. The Summary Judgment Order on the issue of liability under USERRA is fully incorporated into this Order. *Id.* at 1-32.

FN10. *Id.* at 32.

Following the Court's ruling on the issue of liability, I set a status conference in the case. [FN11] The day prior to the scheduled status conference, the City moved to certify the March 28, 2002 summary judgment ruling for interlocutory appeal, pursuant to 28 U.S .C. § 1 292(b). [FN12] During the status conference, I discussed the City's motion to certify with the parties and invited their suggestions regarding the sequencing of further proceedings in the case. The parties agreed that in addition to the City's request for an interlocutory appeal of the Court's ruling on the issue of liability under USERRA, other legal issues pertinent to the question of damages, namely determination of the statute of limitations applicable to the case, needed to first be resolved by the Court before scheduling a trial date. Indeed, a legal determination of the start date for calculating damages for which defendant is liable is critical to the scheduling of further proceedings in the case.

FN11. Docket Entry 72.

FN12. Docket Entry 73.

The parties further agreed that while USERRA does not contain an express provision setting the applicable limitations period for suits filed under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

(Cite as: 2003 WL 1566502 (W.D.Tex.))

Page 3

the Act, it explicitly prohibits the application of state statutes of limitations. [FN13] The question, thus, becomes what federal statute of limitations or other "rule of timeliness" applies to the question of damages in this case.

FN13. 38 U.S.C.A. § 4323(i) (West 2002).

In that regard, the parties submitted a proposed scheduling order for their summary judgment briefing on the issue. [FN14] In that document the parties "agreed that the Court shall abate any ruling on [the] motion to certify until after the Court rules on the parties' motions for partial summary judgment on the issue of any limitations period applicable to the damages and relief claimed by plaintiffs, so that the damages limitations issue may be considered for inclusion in the motion to certify." [FN15] I adopted the parties' agreed proposed scheduling order on May 13, 2002. [FN16]

FN14. Docket Entry 75.

FN15. *Id.* at 1-2.

FN16. *Id.*

*3 Also, on May 13, 2002, the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) for the *limited* purpose of ruling on: "the pending Motion to Certify Memorandum and Order for Appeal (docket entry 73), and any subsequent motions to certify for appeal the Order of 3/28/02, and [ ... ] the anticipated motion(s) for summary judgment relating to damage limitations, and requests to certify for appeal orders relating to the damage limitations issue." [FN17] Consistent with the parties' limited consent, this Order addresses the legal issue of what statute of limitations applies, if any, to the damages claimed by plaintiffs in this USERRA case. [FN18]

FN17. Docket Entry 76.

FN18. *See* Docket Entry 49, Plaintiff's Third Amended Complaint, at 9- 10, for a description of the types of equitable as

well as legal relief the plaintiffs seek in this case.

*III. Parties' Arguments*

The City's cross-motion for summary judgment advances two alternative approaches to the limitations question. First, the City advocates for the borrowing of the two-year statute of limitations applicable to causes of action brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 255(a). [FN19] The City maintains that plaintiffs' claims under USERRA are analogous to the types of wage discrimination claims usually brought under the FLSA, and as such, the court should apply the FLSA's two-year statute of limitations. [FN20] The City, however, has failed to present any case authority, decided under USERRA or any other prior statute regulating veterans' employment and reemployment rights, in which the court has borrowed the FLSA limitations period, as the City requests in this case. [FN21]

FN19. The FLSA also provides a three-year limitations period for any willful violation of the Act. 29 U.S.C.A. § 255(a).

FN20. Docket Entry 79, at 4-6.

FN21. *Id.*

Alternatively, the City argues that the federal residual four-year statute of limitations found in 28 U.S.C. § 1658 may apply to the case. [FN22] In making this argument, the City recognizes that by its express terms, section 1658 is applicable to civil actions which arise under an Act of Congress enacted after the date of the enactment of section 1658, i.e. December 1, 1990. [FN23] Since plaintiffs' action is brought under USERRA, a statute which was enacted on October 13, 1994, after the enactment of section 1658, the City argues the four-year statute of limitations may be applicable to the case. [FN24]

FN22. *Id.* at 7-8.

FN23. *Id.* at 7.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

FN24. *Id.* After plaintiffs embraced the applicability of the four-year statute, the City retreated from its original position and most recently has adamantly objected to the application of § 1658 to the case. Docket entry 80 at 7-10, Docket Entry 83 at 4, and Docket Entry 87 at 4-5.

The parties' disagreement includes the question of how far back in time preceding the filing of their suit the plaintiffs may seek damages. [FN25] The plaintiffs argue that the residual four-year statute of limitations should be applied from the date they filed the instant suit, October 4, 1999. Accordingly, plaintiffs contend the applicable limitations period for purposes of assessing how far back they are entitled to claim back pay relief, for instance, is four years preceding the filing of their suit; that is, October 4, 1995. [FN26]

FN25. Docket Entry 79, at 5-8 and Docket Entry 80, at 10.

FN26. Docket Entry 80, at 10.

The City, on the other hand, argues that plaintiffs' claims for damages accrued no later than the effective date of each collective bargaining agreement ("CBA") forming the basis of their claims. [FN27] As noted in the March 28, 2002 summary judgment order, the CBAs in effect during the times material to this case are the following: the agreement in effect from October 1, 1988 through November 15, 1995, the agreement in effect from November 14, 1995 through September 30, 1999, and the one in effect since September 30, 1999. [FN28] According to the parties' recent submissions, the City last renegotiated the CBA with the plaintiffs' Union in December of 2002. [FN29]

FN27. Docket Entry 79, at 5. According to plaintiffs' "Statement of Undisputed Facts," the permanent, uniformed members of the City's Fire Department are represented by the International Association of Fire Fighters, Local 624 (the Union), which serves as their

exclusive bargaining agent. Since 1974, the Union and the City have executed a series of collective bargaining agreements governing the firefighters' wages, hours, and other terms and conditions of employment. Docket Entry 56, Plaintiffs' Appendix, at ¶ 26.

FN28. Docket Entry 71, at 16 & fn. 66 (citing to Plaintiffs' Summary Judgment Appendix, at ¶ 27; and Amended Joint-Stipulated Facts, Docket Entry 61, at ¶ 29).

FN29. Docket Entry 86, at 2. The City's employment practices challenged in this case are still part of the most recent negotiated CBA between the City and the plaintiffs' Union. *Id.*

*4 Rejecting the City's arguments, I do not find the effective date of each CBA determinative of the limitations issue under USERRA. In the March 28, 2002 Order, the Court explicitly held that the CBAs between the City and the plaintiffs' Union were irrelevant for purposes of determining liability under USERRA, and accordingly, the City could not rely on those agreements to excuse its actions. [FN30] Consistent with this holding, I find the City's argument that plaintiffs' USERRA claims should be measured, for accrual purposes, from the effective date of each CBA, unpersuasive since the employment rights at issue in this case are governed by the Act, and not by the CBAs. To thoroughly consider the City's arguments premised on adoption of the FLSA's two-year limitations period, it is useful to review the effective dates of the various CBAs and how the City argues those effective dates affect the accrual of plaintiffs' claims for damages.

FN30. Docket Entry 71, at 21-22, and Docket Entry 86, at 4.

The City maintains that plaintiffs' claims related to the first CBA were barred, as a matter of law, on October 1, 1990, two years after the effective date of that CBA; i.e., October 1988. [FN31] Likewise, the City argues, plaintiffs' claims related to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

(Cite as: 2003 WL 1566502 (W.D.Tex.))

Page 5

second CBA were barred, as a matter of law, on November 14, 1997, two years after its effective date of November 14, 1995. The City further states that "[a]ll Plaintiffs were employed *prior* to this limitations date such that the suit could have been initiated timely for purposes of contesting the second [CBA]but was not." [FN32] Accordingly, the City argues, that the only possible surviving claims arise under the third CBA, which became effective on September 30, 1999, "shortly before Plaintiffs filed suit." [FN33] The instant suit was filed October 4, 1999. [FN34] Because plaintiffs' claims under the first and second CBAs accrued long before they filed suit in 1999, the City maintains it is entitled to partial summary judgment with respect to all of plaintiff's claims pre-dating *September 30, 1999,* the effective date of the third CBA. [FN35] Alternatively, and at a minimum, the City contends that plaintiffs' claims accrued two years before they filed suit; that is, plaintiffs' claims arising prior to *October 4, 1997,* should be deemed time-barred. [FN36]

> FN31. The City argues that plaintiffs' claims under the first CBA are also barred because USERRA was not enacted until October 13, 1994. Docket Entry 79, at 5 & fn.2.

> FN32. *Id.* at 5 (Emphasis in Original).

> FN33. *Id.* at 6.

> FN34. Docket Entry 1.

> FN35. Docket Entry 79, at 6.

> FN36. *Id.*

Similarly, the City argues that if the court were to use the federal residual four-year limitations period, 28 U.S.C. § 1658, plaintiffs' claims arising from the first CBA were barred, as a matter of law, on October 2, 1992, four years after the agreement became effective. [FN37] Under this argument, the City contends the only viable claims arise under the second and third agreements, which became effective November 14, 1995 and September 30,

1999. Accordingly, the City argues that partial summary judgment should be granted in its favor as to any claim predating *November 14, 1995.* Alternatively, the City agrees with the plaintiff that if the court were to apply the limitations period of section 1658, any claims that predate *October 4, 1995* are barred as a matter of law. [FN38]

> FN37. *Id.* at 7.

> FN38. *Id.* at 8.

**\*5** The City further argues that irrespective of which limitations period applies to the case, the entire case is barred by the equitable doctrines of laches and estoppel. [FN39] Subsequent to the summary judgment order on the liability phase of the case, and despite plaintiffs' opposition, I allowed the City leave to amend its answer to plaintiffs' third amended complaint. [FN40] The affirmative defenses of laches and estoppel, among others, were asserted at that time. [FN41] The plaintiffs respond that the City's use of these defenses to bar the suit *in toto* is untimely since the court has already decided the liability question in favor of the plaintiffs. Plaintiffs further argue that because the City has failed to establish that plaintiffs' delay in filing suit was either unreasonable or otherwise prejudicial the City cannot use these defenses to bar an award of damages. [FN42]

> FN39. *Id.* at 8-9.

> FN40. Docket Entries 81 and 82.

> FN41. Docket Entry 82, at 1.

> FN42. *Id.*

*IV. Summary Judgment Standard*
Determination of the limitations period applicable to the damages and relief claimed by plaintiffs in this USERRA case has been presented to me through cross-motions for partial summary judgment. [FN43] A party is entitled to summary judgment upon motion if the pleadings, depositions, answers to interrogatories, and admissions on file,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

(Cite as: 2003 WL 1566502 (W.D.Tex.))

Page 6

together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. [FN44] Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment; the requirement is that there be no genuine issue of material fact. [FN45] A fact is material if it might affect the outcome of the lawsuit under the governing law. [FN46] A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. [FN47] Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted. [FN48]

FN43. Docket Entries 79 & 80.

FN44. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir.1995); *Neff v. American Dairy Queen Corp .*, 58 F.3d 1063, 1065 (5th Cir.1995), *cert. denied*, 516 U.S. 1045 (1996).

FN45. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

FN46. *Id.* at 248. *See also Thomas v. LTV Corp.*, 39 F.3d 611, 616 (5th Cir.1994).

FN47. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Wise v. E.I. DuPont De Nemours & Co.*, 58 F.3d 193, 195 (5th Cir.1995); *MacMillian v. United States*, 46 F.3d 377, 380-81 (5th Cir.1995).

FN48. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249; *Kunin v. Feofanov*, 69 F.3d 59, 61 (5th Cir.1995); and *Banc One Capital Partners Corp.*, 67 F.3d at 1198.

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. [FN49] To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense, or if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. [FN50] Regardless of whether the moving party accompanies its summary judgment motion with affidavits or other evidentiary materials, the motion must be granted if the evidence before the court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied. [FN51]

FN49. *Celotex Corp. v. Catrett*, 477 U.S. at 323; *Wise*, 58 F.3d at 195; *Burfield v. Brown, Moore, & Flint, Inc.*, 51 F.3d 583, 588 (5th Cir.1995).

FN50. *Edwards v. Aguillard*, 482 U.S. 578, 595 n. 16 (1987); and *Celotex Corp. v. Catrett*, 477 U.S. at 325.

FN51. *Id.*

*6 Once the moving party has carried that burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. [FN52] The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings. [FN53] Rather, the nonmoving party's response must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing the existence of a genuine issue for trial. [FN54] When both parties move for summary judgment, as in this case, each party must carry its own burden as the movant for its motion and as the non-movant in response to the other party's motion . [FN55] All justifiable inferences must still be drawn in favor of the losing party. [FN56]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

FN52. *Fields v. City of South Houston,* 922 F.2d 1183, 1187 (5th Cir.1991).

FN53. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250; *State of Texas v. Thompson,* 70 F.3d 390, 393 (5th Cir.1995).

FN54. *Celotex Corp. v. Catrett,* 477 U.S. at 324; *Fields,* 922 F.2d at 1187; *Neff v. American Dairy Queen Corp.,* 58 F.3d at 1065; *Engstrom v. First Nat'l Bank,* 47 F.3d 1459, 1462 (5th Cir.1995), *cert. denied,* 516 U.S. 818 (1995).

FN55. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996).

FN56. *See Murphy Expl. & Prod. Co. v. Oryx Energy Co.,* 101 F .3d 670, 673 (Fed.Cir.1996).

*V. Discussion*

A. Statute of Limitations

I must decide which statute of limitations applies to this USERRA case. Plaintiffs in this case assert employment discrimination on the basis of their military reserve status, pursuant to Sections 4311 and 4323 of that Act. USERRA is one of a series of statutes enacted over the last half century (at least since the 1940's) to protect the employment and reemployment rights of persons serving in the military. Section 4323 of USERRA does not contain its own statute of limitations. It specifies only that "[n]o State statute of limitations shall apply to any proceedings under this chapter." [FN57] The City argues that the "most analogous" federal statute of limitations is the two-year statute of limitations applicable to FLSA causes of action, 29 U.S.C. § 255(a), and urges the court to "borrow" that statute for application to USERRA claims. The plaintiffs, on the other hand, argue in support of the four-year statute of limitations created by Congress for new federal causes of action not having their own limitations period. 28 U.S.C. § 1658.

FN57. § 4323(i) (West 2002).

I do not find the City's arguments compelling: Plaintiffs' USERRA claims under are not analogous to FLSA claims. As discussed in the March 28, 2002 summary judgment ruling, the twenty-seven hour cap, one of plaintiffs' primary claims in this case, was created as an exception to the FLSA's overtime requirements. [FN58] Likewise, plaintiffs' other claims, particularly those involving denial of overtime and training opportunities, and the treatment of military leave for purposes of bonus day and perfect attendance leave under the CBA, neither involve FLSA violations nor are they similar thereto. [FN59] Further, the City has failed to provide any case authority under USERRA, or any previous statute governing veterans' employment and reemployment rights, in which a court borrowed the FLSA statute of limitations as the City asks this court to do here. I agree with the plaintiffs that in the absence of an "analogous" federal statute of limitations, the federal residual four-year statute of limitations, found in 28 U.S.C. § 1658, should be applied.

FN58. *See* Docket Entry 71, at 16-23.

FN59. *See* Docket Entry 86, at 6.

Recognizing that borrowing an analogous state or federal statute of limitations could lead to inconsistent results, Congress adopted a uniform and general statute of limitations of four years for federal causes of action not governed by an explicit limitations period. Section 1658 of Title 28 provides:

*7 Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [12/1/90] may not be commenced later than 4 years after the cause of action accrues. [FN60]

FN60. 28 U.S.C. § 1658.

As noted previously, USERRA was enacted on October 13, 1994, after the date of enactment of section 1658. [FN61] Although USERRA amended a prior statute, I nevertheless find that it is "an Act of Congress enacted" after December 1, 1990. In this regard, cases brought under 42 U.S.C. § 1981

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

provide some guidance as to how the courts should analyze the applicability of section 1658 to claims premised on statutes amended after enactment of the residual statute. In *Zubi v. AT & T Corporation,* an employment discrimination case under section 1981, the Third Circuit analyzed the possible approaches to determine whether a statute was, in effect, a new Act, and therefore subject to application of the residual statute of limitations. [FN62] Explaining that the preferable interpretation of section 1658 would provide litigants the most certainty in application, the Court attempted to draw a bright line rule:

> FN61. *See North Star Steel Co. v. Thomas,* 515 U.S. 29, 32 (1995) (where the United States Supreme Court, in addressing the traditional rule and expectation that federal courts look to state rather than federal law to "borrow" a limitations period, stated that " '[t]his expectation is reversed for statutes passed after December 1, 1990, the effective date of 28 U.S.C. § 1658 (1988 ed., Supp. V), which supplies a general, 4-year limitations period for any federal statute subsequently enacted without one of its own." ').

> FN62. 219 F.3d 220 (3rd Cir.2000).

[W]hen Congress amends a preexisting statute it does not create a 'new act,' and claims arising under the statute as amended continue to arise under the preexisting statute. It is, thus, only when Congress establishes a new cause of action without reference to preexisting law that Section 1658 applies. *Thus, when determining whether Congress has amended a preexisting statute or created a "new act," how Congress characterizes its own action should be determinative.* We conclude that this is the closest thing to a bright line that can be drawn while remaining faithful to the statutory text and its legislative history. [FN63]

> FN63. *Id.* at 225 (emphasis added).

The Court in *Zubi,* then determined that when

Congress passed the Civil Rights Act of 1991, it was merely amending 42 U.S.C. § 1981, making section 1658 inapplicable. While the *Zubi* approach has been endorsed by the Eighth and Seventh Circuits, as well as numerous lower courts, [FN64] the federal courts are still split in determining which statute of limitations applies to suits brought under the amended version of section 1981. [FN65]

> FN64. *See e.g., Madison v. IBP,* 257 F.3d 780, 797-98 (8th Cir.2001), *cert. granted,* 122 S.Ct. 2583 (2002); and *Jones v. R.R. Donnelley & Sons Co.,* 305 F.3d 717, 724-25 (7th Cir.2002). *See also Coleman v. Shoney's, Inc.,* 145 F.Supp.2d 934, 938 (W.D.Tenn.2001); and *Campbell v. National R.R. Passenger Corp.,* 163 F.Supp.2d 19, 23-24 (D.D.C.2001).

> FN65. *See Harris v. Allstate Insurance Co.,* 300 F.3d 1183, 1186- 87 (10th Cir.2002) ("The Civil Rights Act of 1991 ... essentially created a new cause of action to challenge an employer's discriminatory post-formation conduct."); and *Kinley v. Norfolk Southern Railway Company,* 230 F.Supp.2d 770, 776 (E.D.Ky.2002) (applying the four year statute of limitations created by 28 U.S.C. § 1658 to plaintiff's § 1981 claim).

In contast to the Civil Rights Act of 1991, USERRA was essentially a new Act. Section 4311(b) provides that: "[a]n employer may not discriminate in employment against or take any adverse employment action against any person because such person ... has exercised a right provided for in this chapter." [FN66] Section 4311(a) further states that: "[a] person who is a member of [ ... ] a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or *any benefit of employment* by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation." [FN67] The term "benefit of employment" under section 4311 is broadly defined. [FN68] It includes "any advantage, profit,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement, or an employer policy, plan, or practice and includes [ ... ] bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." [FN69] Discussing the relevant legislative history preceding enactment of USERRA, cases have noted that although retaining some provisions of preexisting statutes, USERRA was a new legislative scheme designed to "*replace* the [previous statute known by its acronym "VRRA"] in order to 'clarify, simplify, and where necessary, strengthen the existing veterans' employment and reemployment rights provisions." [FN70] Consistent with this purpose, cases have held that USERRA is "to be broadly construed and strictly enforced." [FN71]

FN66. 38 U.S.C. § 4311(b).

FN67. § 4311(a)(Emphasis added).

FN68. *See Yates v. Merit Systems Protection Board,* 145 F.3d 1480, 1483 (Fed.Cir.1998).

FN69. § 4303(2).

FN70. *See Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 106 (2d Cir.) (quoting H.R.Rep. No. 65, 103rd Cong., 2d Sess. 18 (1994), *reprinted in* 1994 U.S.C.C.A.N. at 2449, 2451) (Emphasis added), *cert. denied,* 517 U.S. 1190 (1996). *See also Fernandez v. Department of the Army,* 234 F.3d 553, 557 (Fed.Cir.2001) (USERRA does not have retroactive application; in passing USERRA, Congress specified that the provisions of § 4311 became effective on the date of enactment); and *Newport v. Ford Motor Co.,* 91 F.3d 1164, 1167 (8th Cir.1996).

FN71. *Yates,* 145 F.3d at 1484-85; *Petersen v. Department of the Interior,* 71 M.S.P.R. 227, 239-40 (1996) (discussing

the intent of Congress in adopting a mixed-motive burden-shifting scheme in these cases); and *Williams v. Department of the Army,* 83 M.S.P.R. 109, 112 (1999) (USERRA substantially expanded the scope and coverage of the prior discrimination provision, found in the Veterans' Reemployment Rights Act ("VRRA"), 38 U.S.C. § 2021(b)(3) (1988) ) (Emphasis added). It should be noted that § 2021 was part of chapter 43 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, Pub.L. No. 93-508 , 88 Stat, 1578, *reprinted in* 1974 U.S.C.C.A.N. 1818, 1837. Chapter 43 is commonly referred to as the Veterans' Reemployment Rights Act ("VRRA"). The provisions of the VRRA were codified at 38 U.S.C. §§ 4301-4307 (as chapter 43) immediately prior to October 13, 1994, after their renumbering by the Veterans' Benefits Act of 1992, Pub.L.No. 102-568, 1992 U.S.C.C.A.N. (106 Stat.) 4320, from 38 U.S.C. §§ 2021-2027 (also as chapter 43). They were originally codified when enacted as section 404 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974. *See* Historical and Statutory Notes following 38 U.S.C.A. Chapter 43 Table (West Supp.1988). Thus, references to the VRRA include its predecessor statutes. *Williams,* 83 M.S.P.R. at 112 & fn.1.

**\*8** Important to the resolution of the limitations question, section 4311(c)(1) of the Act sets forth the parties' respective burdens of proof:

An employer shall be considered to have engaged in actions prohibited under subsection (a) [of USERRA], if the person's membership, application for membership, service, application for service, or obligation to serve in the uniformed services is *a motivating factor* in the employer's action, *unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.* [FN72]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

FN72. § 4311(c)(1)(Emphasis added).

Section 4311 was the congressional response to the United States Supreme Court decision in *Monroe v. Standard Oil Co.* [FN73] In that case, the Court found that the Vietnam Era Veterans' Readjustment Assistance Act of 1974, USERRA's predecessor statute, [FN74] "was enacted for the significant purpose of protecting the employee/reservist against discrimination like discharge and demotion, motivated *solely* by reserve status." [FN75] Thus, through the enactment of USERRA and specifically section 4311, Congress repealed the "sole cause" standard enunciated in *Monroe,* insisting instead on the "motivating factor" standard. [FN76] This greatly relaxed causation standard created new substantive liabilities, and is critical to the March 28, 2002 summary judgment ruling in the case. [FN77]

FN73. 452 U.S. 549 (1981).

FN74. *See* note 75, *supra.*

FN75. *Monroe,* 452 U.S. at 559 (Emphasis added). *See also Pignato v. American Trans Air, Inc.,* 14 F.3d 342 (7th Cir.) (holding that in order to establish employer liability in mixed-motive cases, the impermissible motive must be the controlling reason for the adverse action), *cert. denied,* 512 U.S. 1205 (1994).

FN76. *See Newport,* 91 F.3d at 1167 (noting that USERRA was enacted in response to *Monroe* and changed *Monroe's* "sole cause" standard to "a motivating factor" standard).

FN77. Docket Entry 71, at 11-31.

For these reasons, I am persuaded that the four-year statute of limitations created by 28 U.S.C. § 1658 should apply to plaintiffs' claims under section 4311 of USERRA. I thus conclude that plaintiffs may premise their USERRA claims for damages on the City's discriminatory employment actions that occurred on or after October 4, 1995,

which date is four years preceding the date plaintiffs filed the instant suit. [FN78] Any claims for damages premised on actions prior to that date are time-barred.

FN78. *See Kinley,* 230 F.Supp.2d at 776 (setting the limitations issue from the date of the filing of the suit).

B. Laches and Estoppel

My determination concerning the applicability of section 1658 to the case disposes of the laches defense. Laches cannot be used to bar relief to which plaintiffs are entitled within the statutory period. "Laches within the term of the statute of limitations is no defense at law." [FN79] As one Circuit Court stated: "separation of powers' principles dictate that an equitable timeliness rule adopted by courts [*i.e.,* laches] cannot bar claims that are brought within the legislatively prescribed statute of limitations." [FN80] In other words, because there is an applicable statute of limitations, "neither laches nor its absence is relevant." [FN81]

FN79. *See U.S. v. Mack,* 295 U.S. 480, 485 (1935).

FN80. *Lyons Partnership, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 797-98 (4th Cir.2001)(laches did not bar plaintiffs' claims in copyright and trademark lawsuit).

FN81. DAN B. DOBBS, LAW OF REMEDIES, DAMAGES-EQUITY-RESTITUTION, at 77, § 2.4(4) (2d Ed. West 1993).

Despite this general principle, some cases decided under USERRA's predecessor statute analyzed the timeliness of the suit by considering laches. [FN82] Even if I were to find section 1658 inapplicable to the case, I would still conclude that plaintiffs' claims for damages for the four years preceding the filing of the instant suit are not barred by laches. [FN83]

FN82. *See Wallace,* 874 F.Supp. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

Page 11

376-77. *See also Miller v. City of Indianapolis,* 281 F.3d 648 (7th Cir.2002) (an USERRA case where the applicability of section 1658 was not discussed and where laches considered).

FN83. *See Lyons,* 243 F.3d at 799 ("When federal courts, in the exercise of their equitable power, consider laches, they are guided by the limitations period that they would borrow for actions at law and presume that if an equitable claim is brought within the limitations period, it will not be barred by laches.").

*9 The doctrine of laches involves more than merely the passage of time. [FN84] In order to invoke the doctrine of laches, a defendant must show an inexcusable delay in asserting a right and undue prejudice to the defendant." [FN85]

FN84. *See Bush v. Oceans Intern.,* 621 F.2d 207, 211 & fn.3 (5th Cir.1980) ("Laches is based not on simply the passage of time, as is a statute of limitations, but rather upon changes of conditions or relationships.").

FN85. *Wallace,* 874 F.Supp. at 377. *See also Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 804-06 (8th Cir.1979) (discussing the defendant's burden of proving the affirmative defense of laches as a bar to a suit), *cert. denied,* 446 U.S. 913 (1980).

The City failed to introduce any summary judgment evidence that any "delay" in the plaintiffs asserting their claims was inexcusable or that the City was prejudiced by such delay. Merely arguing that one of the plaintiffs is retired, as the City has done, does not establish a laches bar. Based on the complexity of this case and in light of the numerous plaintiffs asserting USERRA violations, I cannot conclude that the filing of this suit, five years after the enactment of the USERRA, constitutes an inexcusable delay, particularly when plaintiffs are seeking damages for a limited period of time.

[FN86]

FN86. *See Petry v. Delmara Power & Light Co.,* 631 F.Supp. 1532, 1534 (D.Del.1986) (four-year delay in bringing a claim under the VRRA did not constitute laches). The instant case is also distinguishable from *Miller v. City of Indianapolis,* a case relied upon by the City. In *Miller,* the Seventh Circuit affirmed the district court's holding that the reservists' claims, based on treatment twenty to thirty years earlier at the hands of supervisors who in some instances were retired or dead, were barred by laches. 281 F.3d at 653. While the plaintiffs in this case have been employees of the City for some time, they are seeking damages for a limited period of time only, that is from October 4, 1995. Further, the Seventh Court in *Miller* explicitly recognized that the facts leading it to find that laches barred plaintiffs' claims were "unusual." *Id.* at 652. Those facts, including the demonstrated prejudice to the defendant, are simply not present in the instant suit, as I discuss below.

Further, even if the City had supported its claims by competent or probative summary judgment proof, its arguments of prejudice remain unpersuasive. The City advances the following to establish prejudice: (1) that at least one of the named plaintiffs is no longer working for the City, (2) a number of potential witnesses may be retired or no longer available, [FN87] (3) and that since it has also paid all of its employees under the terms of the CBA (terms which, according to the City, the plaintiffs agreed upon through their Union but which they now claim violate USERRA), the City "would be prejudiced by any additional monetary award." [FN88]

FN87. This argument is presumably speculative as no competent supporting summary judgment proof was presented.

FN88. Docket Entry 79, at 8-9.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

Page 12

However, arguments similar to those advanced by the City have been rejected by the courts as being inadequate to establish prejudice and a laches bar. [FN89] While the City claims prejudicial reliance on the "plaintiffs' representation, through their Union, that the [CBA] would be satisfactory ...," [FN90] it failed to provide competent supportive summary judgment evidence. It is undisputed that the City never changed its position regarding the employment practices being challenged in this case in reliance on the CBAs. Further, because employment rights conferred under a federal statute such as USERRA cannot be waived through an employment agreement, such as the various CBAs in effect during the relevant time periods, the City's purported reliance on those agreements is irrelevant. [FN91] Since the City relies on the same arguments to establish estoppel as it does to support its laches argument, the City's cross motion for summary judgment on both equitable doctrines should be *denied.*

> FN89. *See Wallace,* 874 F.Supp. at 377 (employer not unduly prejudiced by the cost of defending the suit now instead of earlier and by continuing to conduct its normal business operations); and *Novak v. Mackintosh,* 937 F.Supp. 873, 880 (D.S.D.1996) (no prejudice when there was no evidence lost or witnesses unavailable or any evidence that the employer changed its position in any way that would have occurred if there had not been the delay).

> FN90. Docket Entry 79, at 9.

> FN91. *See Carney v. Cummins Engine Company,* 602 F.2d 763, 766-67 (7th Cir.1979) ("It is immaterial that non-military employees of defendant on leave of absence would not be entitled to overtime opportunities [case citations omitted] since the right of reservists to such opportunities is governed by statute rather than by collective bargaining agreement. *Nor does it matter that affording plaintiff relief might conflict with*

> *the collective bargaining agreement between defendant and the Union."* ) (Emphasis added); and Docket Entry 71, at 19-23.

Moreover, to the extent the City has now asserted the equitable doctrines of laches and estoppel as affirmative defenses to bar this suit *in toto,* those defenses have been *waived* as the issue of liability has already been determined. The City failed to amend its answer and brief those defenses prior to the Court's entry of summary judgment on the issue of liability. Plaintiffs moved for leave to file their third amended complaint on January 9, 2001, which was granted on January 18, 2001. [FN92] The City requested leave to file an amended answer to the plaintiffs' third amended complaint on January 16, 2001. [FN93] The City's answer, however, did not raise laches and estoppel as affirmative defenses. It was at that time, when the issue of liability was still pending, that the City should have asserted these defenses: It failed to do so. Raising them now, after the liability question has been decided, is simply too late.

> FN92. Docket Entries 46 & 49.

> FN93. Docket Entry 47.

### VI. Conclusion

**\*10** Based on the foregoing, I hereby *GRANT* plaintiffs' request for partial summary judgment (Docket Entry 80) and hold that the plaintiffs may assert their claims for damages for the four year period preceding the filing of their suit; that is from October 4, 1995, through the date of judgment. The City's cross motion for partial summary judgment (Docket Entry 79) is, thus, *GRANTED, IN PART, only* to the extent it alternatively argues in support of the application of section 1658 to the case. In all other respects, the City's motion is *DENIED.*

### Motions, Pleadings and Filings (Back to top)

• 2002 WL 32119363 (Verdict and Settlement Summary) (Mar. 28, 2002)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1566502 (W.D.Tex.), 172 L.R.R.M. (BNA) 2240

**(Cite as: 2003 WL 1566502 (W.D.Tex.))**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

**(Cite as: 2002 WL 32060140 (E.D.Tenn.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Tennessee, Southern Division.
Dr. Andrew AKHDARY, Plaintiff,
v.
CITY OF CHATTANOOGA d/b/a Chattanooga
School System and Hamilton County d/b/a
Hamilton County School System, Defendants.
**No. 1:01-CV-106.**

May 22, 2002.

*MEMORANDUM*

EDGAR, Chief J.

*1 Plaintiff Dr. Andrew Akhdary ("Akhdary") brings a claim of discrimination under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-33 ("USERRA"), and its antecedent, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021-27 ("the Act"), against his former employer, the City of Chattanooga, and against his current employer, Hamilton County, for failure to promote, denial of retirement benefits and sick leave, and hostile work environment.

This matter is presently before the Court on motion for summary judgment by defendant Hamilton County ("County") [Court File No. 15] and motion for summary judgment by defendant City of Chattanooga ("City") [Court File No. 22]. The plaintiff opposes the motions. For the reasons expressed below, the motion by the City [Court File No. 22] will be GRANTED and the motion by the County [Court File No. 15] will be DENIED.

I. STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.,* 253 F.3d 900, 907 (6th Cir.2001). The Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex Corp.,* 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson,* 477 U.S. at 252; *McLean v. Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir.2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 248, 249; *National Satellite Sports,* 253 F.3d at 907.

II. FACTS

The record will suggest the following findings of fact if the allegations of the plaintiff's complaint are viewed in the light most favorable to Akhdary. The Court makes these findings of fact solely for the purposes of resolving the motion before it.

After Akhdary received his teacher certification in 1974, he was hired by the City to be a school

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

**(Cite as: 2002 WL 32060140 (E.D.Tenn.))**

teacher at Tyner Junior High School ("Tyner") in 1975. Since that time, Akhdary continued his education, receiving a master's degree in curriculum instruction in 1987, an additional certification in childhood counseling in 1988, and a doctorate in general administrative leadership in 1996. In general, Akhdary is a successful teacher, is well-liked by students and faculty, and has received several commendations.

**\*2** Akhdary was employed by the City until July 1, 1997. On this date, the City school system essentially went out of business, and all employees and administrators of the City school system became the employees of the County department of education. All personnel records kept by the City were transferred to the County. Akhdary currently is employed by the County as a school teacher at the Chattanooga School for the Arts and Sciences ("CSAS"). He has been a teacher at CSAS since 1988.

Akhdary enlisted in the United States Navy Reserve in 1978. Since enlisting, he has risen from a status of E-5 to his current position of Deputy Officer in Charge at the Coalition Intelligence Center. The Navy values Akhdary for his Arabic linguistic ability and his analysis of events in the Mid-East. As a Navy reservist, he is required to perform a minimum of twelve days of Annual Training per year and monthly weekend drills. A reservist may volunteer for additional training. Aside from required schools and involuntary recall pursuant to a Presidential Select Reserve Call-up, the scheduling of training is somewhat flexible. Akhdary was called for active duty in the fall of 2001 and is currently based in Florida while on extended military leave and unpaid furlough from the County.

Akhdary complains of discrimination based on his reservist status by the City and the County. Akhdary characterizes the treatment he received from City administrators over the years as "abusive" and "harassment." Furthermore, he claims that the denial of promotions and benefits was motivated by his reservist status. The discrimination began as early as the 1985-1986 academic year.

Akhdary first applied for an assistant principalship at Tyner for the 1985- 1986 academic year. He did not receive the promotion. Since that time, he has applied for numerous administrative positions. Although there is evidence that Akhdary is qualified for an administrative position, he never received a promotion.

Virgil Vandergriff was acting principal of Tyner during the 1986-1987 academic year. Akhdary claims to have been embarrassed by having been accused of "double-dipping" while on military leave by Vandergriff. Apparently, Vandergriff was referring to Akhdary receiving a paycheck from both the Navy and the City during military leave. At one point, the City required Akhdary to reimburse the school system for the money he received from the City while on military leave by deducting this amount from his paycheck. After filing a grievance, the City reimbursed Akhdary for the money illegally deducted from his paycheck.

Stuart Silberman ("Silberman") became principal at Tyner in 1987. Thereafter, Silberman and Akhdary developed a conflict at least in part due to Akhdary's military leave. Silberman did not want Akhdary to take his military leave. In one alleged conversation, Silberman stated to Akhdary, "Nobody crosses me and gets away with it," and "I will ruin you." Other administrators in the central office reportedly expressed a preference for Akhdary to reschedule his military leave. Although Silberman had written a letter of recommendation for Akhdary to attend a leadership training program-understood by Akhdary and others to be required for promotions to administrative positions in the school system-Silberman later rescinded the recommendation because Akhdary scheduled his military leave during the school year. Akhdary continued to apply for the leadership training program, but without a recommendation by his supervisor, he was never admitted into that program.

**\*3** After Akhdary transferred to CSAS in 1988, he applied for an assistant principal position at the school. During an interview with the principal of CSAS, Buz Nembirkow, there is evidence that Akhdary was asked, "Why does [Silberman] hate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

(Cite as: 2002 WL 32060140 (E.D.Tenn.))

Page 3

you so much?" Silberman had become the director of personnel in the central office and later became superintendent of personnel. Akhdary did not receive the promotion.

Akhdary experienced what he characterizes as abusive or humiliating encounters with other City administrators. When he presented his military orders to Steve Prighozy, principal of CSAS during 1988-1989, Akhdary was asked what he does in the military. After Akhdary responded that he worked in intelligence and therefore could not tell exactly what he does, it is alleged that Steve Prighozy stated, "You're just not going to go." The record contains evidence that Steve Prighozy also stated that he knew several people in the State Department and could call somebody to stop Akhdary from going on his military leave. Akhdary alleges that the assistant principal at that time, Joyce Hardaway, stated, "If you're such hot stuff, why don't you tell us what it is that you do."

William Kennedy ("Kennedy") was the principal at CSAS from 1989 until January 2002. In 1998, Kennedy wrote to Akhdary's commanding officer requesting adjustment in Akhdary's military leave to allow for Akhdary's presence during certain times of the academic year.

There is evidence that Wilhelmina Moore, an assistant principal at CSAS, made negative comments to Akhdary about his military service. During an interview for an administrative position, she asked, "Andy, what about the Navy?" Akhdary asked for clarification, and she asked, "If we hire you, are you going to be still gone like you are always gone?" She allegedly commented that Akhdary was not administrative material and that he needed to be at school more. The record does not clearly demonstrate whether this alleged conversation occurred before or after the City school system was abolished.

During Akhdary's tenure at CSAS, he experienced much conflict with another assistant principal, Cindy Dees, who, according to Akhdary, warned him that his recent military orders would cause his students to suffer. Akhdary asserts that Dees stated,

"You're just going to have to choose between the Navy and being a teacher." When Akhdary expressed his commitment to both endeavors, she stated, "Well, you need to quit your job in here and go in the Navy full time." On another occasion, during a faculty meeting, Akhdary asked for clarification on an issue that was discussed while he was on military leave. Cindy Dees responded, "Well, you chose not to be here." When Akhdary protested, she stated, "You could've been here if you wanted to." Whether these statements were made is, of course, disputed. For purposes of summary judgment, however, the Court must consider that the statements were indeed made.

*4 Cindy Dees engaged in other behavior that Akhdary deemed to be abusive and humiliating regarding his military commitment. Another problem Akhdary had with Cindy Dees involved her leave time from school. It is unclear from the record whether the problems with Cindy Dees occurred before or after the City school system was abolished.

As principal, William Kennedy appointed persons to fill vacancies at CSAS after receiving a recommendation from a committee, comprised of parents and faculty, responsible for interviewing applicants. While William Kennedy was principal, Akhdary applied at least two times for a position as assistant principal. William Kennedy asserts that Akhdary was not recommended by the committee and, consequently, was not appointed to the position. In February 2000, William Kennedy received a letter from Akhdary expressing his continued interest in an administrative position at CSAS.

When the City school system was abolished in 1997, the system for hiring administrators changed, taking away much of the discretion of each school's decision makers. Changing the hiring process is asserted to have been motivated by the County's desire to eliminate the "good ole boy" system. Akhdary was not aware of the changes in the hiring process. Richard Smith, an assistant superintendent of County schools responsible for making recommendations to the director of schools concerning administrative appointments, has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

**(Cite as: 2002 WL 32060140 (E.D.Tenn.))**

Page 4

described the standardized application process for vacancies occurring at the end of an academic year. First, the County advertises the position at the school, the central office, and the web site, and solicits applications from certified personnel. Once Richard Smith's office receives completed applications, including an application and writing sample, from a sufficient number of persons, the applications are forwarded to Lonita Davidson, the assistant superintendent for personnel services. That office verifies each applicant's qualifications. Richard Smith's office then arranges for interviews with each qualified applicant. The interviewers rank each applicant, and from these ranking, Richard Smith makes a recommendation to the superintendent, who then usually appoints that person to the position.

The process for filling administrative vacancies that occur during the academic year is slightly different. The vacancy is not advertised; rather, the superintendent appoints an individual to this interim position. Richard Smith's office recommends to the superintendent that he appoint the most qualified person who had applied unsuccessfully for previous administrative vacancies. The appointed person is not entitled to keep the position from year to year, and it will be filled permanently prior to the beginning of the next academic year, pursuant to the standardized application process described above. Richard Smith asserts that soliciting input from a school's principal on who should be appointed to a vacancy would violate the County's hiring protocol. Participation in the County's Leadership Fellows group is not required of assistant principal candidates.

*5 At the beginning of the 2000-2001 academic year, William Kennedy took a leave of absence from his principalship. The superintendent appointed Wilhelmina Moore, one of the assistant principals at CSAS, to serve as interim principal. This appointment caused CSAS to have an interim vacancy for an assistant principalship. The superintendent appointed Jim Boles, a teacher at CSAS and participant in the leadership program, to be assistant principal trainee. Unlike Akhdary, Jim Boles did not have a doctorate degree. Richard

Smith asserts that this appointment conformed to the County's hiring protocol.

Although the County utilizes a standardized protocol for hiring administrative personnel, evidence in the record shows that administrators in a particular school do have some input in the hiring process. Wilhelmina Moore asserts that CSAS administrators made the decision that Jim Boles should be appointed to the assistant principalship, not Richard Smith's office. William Kennedy asserts that the superintendent's office solicited his opinion on who should be appointed to the assistant principalship. According to William Kennedy, he did not recommend Akhdary because he lacked people skills and the ability to bring parties together of different mind and to negotiate resolutions.

Richard Smith asserts that although the City transferred all personnel documentation to the County, his office cannot locate any documents supporting or refuting Akhdary's claims against the City. He asserts that his office has no record of administrative vacancies, Akhdary's applications, or interview notes prior to 1997.

Akhdary's principal claim is that the City and County failed to promote him. He also claims that the County failed to accurately report his retirement benefit credits to the Tennessee Consolidated Retirement System and the County denied the accrual of Akhdary's sick leave while on active military duty.

Akhdary filed suit on April 13, 2001. He asserts that he delayed filing because of his fear of retaliation by his employers in light of threats he received from Stuart Silberman; he could not afford to hire an attorney; and he wanted to give the defendants the opportunity to right the wrong. The County asserts that should Akhdary prevail, it would be subjected to liability for the City's actions because the City school system no longer exists. The City asserts that it has transferred all of its personnel records to the County and cannot defend the claim. Furthermore, the County is unable to locate any documentation that support or refute Akhdary's claims against the City.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

(Cite as: 2002 WL 32060140 (E.D.Tenn.))

Page 5

III. ANALYSIS

At the outset, the Court must first address the defendants' argument that Akhdary's claims are barred by the statute of limitations. Both the VRRA and the USERRA expressly disallow the use of a State statute of limitations. *See* 3 8 U.S.C. § 2 022 (1988); 38 U.S.C. § 4323(i); *see also Stevens v. Tennessee Valley Authority,* 712 F.2d 1047, 1054-55 (6th Cir.1983). In *Stevens,* the court concluded that state statutes of limitations should not be applied to veterans' reemployment actions. The legislative history to the USERRA shows that Congress specifically endorsed the *Stevens* conclusion. *See* H.R. REP. No. 103-65(I), at 39 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2472.

*6 The defendants assert that a federal statute of limitations is applicable to Akhdary's claims. The statute provides that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658. Because this statute was enacted in 1990 and it applies only to claims created by after-enacted statutes, it clearly does not apply to Akhdary's claims under the VRRA.

Section 1658 also does not apply to Akhdary's claims under the USERRA. Section 1658 applies "only when Congress establishes a new cause of action without reference to preexisting law." *Zubi v. AT & T Corp.,* 219 F.3d 220, 225 (3d Cir.2000); *see also Madison v.. IBP, Inc.,* 257 F.3d 780, 798 (8th Cir.2001); *Campbell v. National R.R. Passenger Corp.,* 163 F.Supp.2d 19, 25 (D.C.Cir.2001); *Coleman v. Shoney's Inc.,* 145 F.Supp.2d 934, 935-38 (W.D.Tenn.2001). The USERRA does not establish a new cause of action; instead, it amends the preexisting law of the VRRA. Thus, there is no statute of limitations that applies to Akhdary's claims in this case.

The defendants also claim that Akhdary's inexcusable delay has caused them prejudice in defending this case and, therefore, laches should bar his claims. The doctrine of laches is the only

doctrine used to prevent stale claims under the VRRA and the USERRA. *See Stevens,* 712 F.2d at 1055. However, Congress advised that laches should be used sparingly. *See* H.R. REP. No. 103-65(I), at 39 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2472.

Laches is the negligent and unintentional failure to protect one's rights. *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,* 270 F.3d 298, 320 (6th Cir.2001). As an affirmative defense, the burden of proof lies with the defendants. A defendant must prove, by a preponderance of the evidence, "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* There is a strong presumption that a plaintiff's delay in bringing suit is not unreasonable where the statute of limitations has not lapsed. *Id.* at 321; *see Stevens,* 712 F.2d at 1056. However, this rule cannot be strictly adhered to here in light of the clear intent of Congress for courts to eschew statutes of limitations in these types of claims. *See Stevens,* 712 F.2d at 1056. As such, no presumption of laches will be applied to Akhdary's case; therefore the defendants shall bear the burden of proving laches.

The Court examines the equitable circumstances affecting this case, including "the length of the delay, the reasons therefor, how the delay affected the defendant, and the overall fairness of permitting the assertion of the claim." *See id.* (quoting *Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 804- 06 (8th Cir.1979)).

*7 The defendants claim that Akhdary's delay in bringing this action is inexcusable. Akhdary's first claim of discrimination accrued in 1985. He filed suit in 2001. In explaining his delay, Akhdary asserts that he could not afford an attorney, he feared reprisal, and he wanted to give his employers the opportunity to right their wrong. Inability to pay counsel cannot excuse a delay of this length especially considering the provisions in the statutes allowing for assistance by the Attorney General and a waiver of fees and costs. *See, e.g., Leggett v. Standard Oil Co.,* 149 U.S. 287, 294 (1893) (upholding laches bar to patent infringement suit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

**(Cite as: 2002 WL 32060140 (E.D.Tenn.))**

where plaintiff's excuse for the delay was his poverty); *Jeffries v. Chicago Transit Authority,* 770 F.2d 676, 680 (7th Cir.1985) (finding delay by Title VII plaintiff where excuse is inability to pay attorney). Furthermore, allowing the defendants an opportunity to right the wrong is not a legitimate excuse for Akhdary's delay.

Although the fear of retaliation could excuse a plaintiff's delay, Akhdary's claims are unreasonable. Prior to Stuart Silberman's threat, Akhdary had successfully challenged the City regarding his lost wages. He had no indication that his discrimination claim would not be addressed by the City. Moreover, each school's principal had hiring discretion. Even though he later became responsible for personnel matters in the central office, there is no proof that Stuart Silberman could have influenced the principals that denied promotions to Akhdary. Akhdary's claims against the City were ripe at the time the school systems merged. He would have had no legitimate fear of reprisal after the abolition of the City school system.

The defendants have also shown that Akhdary's delay caused prejudice to the defense. The City is prejudiced in that the City school system no longer exists, and all personnel documentation has been forwarded to the County. The County is prejudiced by Akhdary's delay because not only would it be liable for any damages caused by the City, *see* T.C.A. § 49-5-203, but it also does not have any documentation on the promotions that Akhdary claims to have been denied. Both defendants would be prejudiced by lost evidence, faded memory, and the passage of time-up to 16 years have passed.

Although keenly aware of Congress' admonition that laches be used sparingly, the Court concludes that laches is a successful defense here. For the reasons expressed and in the interest of fairness, the City's motion [Court File No. 22] will be GRANTED. All claims against the City are barred by laches and will be DISMISSED. However, Akhdary's claims against the County accruing after July 1, 1997, are not barred by laches.

The County further challenges the allocation of the

burden of proof and the standard by which Akhardy's discrimination claims should be adjudged. Because the claims against the City will be dismissed, the arguments arising out of the VRRA are moot.

**\*8** Since 1994, the USERRA has protected reservists from discrimination by public and private employers based on their reservist status:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a). An employer is liable:

> if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a *motivating* factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C. § 4311(c) (emphasis added).

The Court applies the burden-of-proof allocations utilized by most courts in discrimination claims under the USERRA, *see NLRB v. Transportation Mgmt. Corp.,* 462 U.S. 393, 401 (1983) (modified by *Director, Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267 (1994)), rather than the *McDonnell Douglas* framework applied in other discrimination claims. See *Gagnon v. Sprint Corp.,* 284 F.3d 839, 853 (8th Cir.2002); *Sheehan v. Dept. of Navy,* 240 F.3d 1009, 1013 (Fed.Cir.2001); *Gummo v. Village of Depew, NY,* 75 F.3d 98, 106 (2d Cir.1996).

Proper analysis, in the context of summary judgment, requires an initial determination of whether there is sufficient evidence from which a rational jury could infer that Akhdary's status or conduct as a reservist was a substantial or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

**(Cite as: 2002 WL 32060140 (E.D.Tenn.))**

Page 7

motivating factor in his denials for promotion. Akhdary bears this burden by a preponderance of the evidence. If this evidence exists, then the Court must next determine whether it could be said as a matter of law that the County would have denied Akhdary promotions even if he had not been a reservist. The County bears this burden by a preponderance of the evidence. *See Gagnon,* 284 F.3d at 853-54; *Sheehan,* 240 F.3d at 1013; *Gummo,* 75 F.3d at 106; *Transportation Mgmt.,* 462 U.S. at 400-01.

"The term 'motivating factor' means that if the employer was asked at the moment of the decision what its reasons were and if it gave a truthful response, one of those reasons would be the employee's military position or related obligations." *Robinson v. Morris Moore Chevrolet-Buick, Inc.,* 974 F.Supp. 571, 576 (E.C.Tex.1997) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250 (1989) (addressing Title VII gender discrimination claim and related affirmative defense)). If the County "relied upon, took into account, considered, or conditioned its decision" on Akhdary's reservist status, then the reservist status is a motivating factor. *Id.*

*9 Discriminatory motive may be proven by either direct or circumstantial evidence. *See Sheehan,* 240 F.3d at 1014. Because direct evidence rarely exists, discriminatory motivation may be reasonably inferred from a variety of factors. These factors include:
 proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. *Id.*

Akhdary has presented sufficient evidence from which a reasonable jury could infer a discriminatory motivation on behalf of the County. He has presented evidence from which it could be

concluded that not only did County administrators consider his reservist status and consequent obligations in its decisions to deny promotions, but also that County administrators expressed hostility for his commitment to the Navy Reserves. There is evidence that Akhdary was chastised for missing in-service training, yet assistant principal Cindy Dees was permitted to vacation while school was in session. William Kennedy claims that Akhdary would not be considered for promotion because of his lack of people skills; however, Akhdary received many commendations from students and faculty over the years and had quite a successful career in the Navy Reserves.

Taking the evidence in the light most favorable to Akhdary, the County has not carried its burden of establishing that it would have denied Akhdary promotions notwithstanding his reservist status. The County argues that Akhdary did not apply for a promotion and, therefore, it is entitled to summary judgment. There is evidence that Akhdary had the certifications and qualifications to become an assistant principal. Despite the County's assertions that the application process changed after the City school system was abolished and that Akhdary did not comply with this process, the Court concludes that there is a general issue of material fact as to whether the hiring process was standardized. Because of the factual disputes, summary judgment will not be granted on the basis that Akhdary did not submit an actual application for an administrative position. Evidence that Akhdary expressed his general interest in an administrative position to William Kennedy as late as February 2000, coupled with his assertion that he was unaware of the changes in the hiring process after the County became his employer, is sufficient for Akhdary's claims to survive summary judgment.

This is not to say that Akhdary will prevail at trial on all of his claims. Whether the County was motivated by Akhdary's reservist status and whether the County can prove that its actions would have been taken in the absence of Akhdary's military status are questions for a jury to decide.

*10 The County also has not established that there

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 32060140 (E.D.Tenn.)

**(Cite as: 2002 WL 32060140 (E.D.Tenn.))**

is no genuine issue of material fact surrounding the denial of Akhdary's benefits. The record offers no proof on this issue other than Akhdary's statements that the County failed to report accurately his retirement benefit credits to the retirement system and miscalculated his sick leave while on active military duty and the County's denial of his assertions.

IV. CONCLUSION

For the foregoing reasons, the City's motion for summary judgment [Court File No. 22] will be GRANTED. The County's motion for summary judgment [Court File No. 15] will be DENIED. An order will enter.

*ORDER*

This matter is before the Court on the defendant City's motion for summary judgment [Court File No. 22] and the defendant County's motion for summary judgment [Court File No. 15]. The City's motion is GRANTED. All claims against the City are DISMISSED and the City is dismissed as a party. The County's motion is DENIED. The plaintiff's remaining claims under USERRA include discrimination for failure to promote, denial of retirement benefits and sick leave, and "hostile work environment," accruing after July 1, 1997, against the County. The parties shall prepare for trial.

SO ORDERED.

2002 WL 32060140 (E.D.Tenn.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00106 (Docket)

(Apr. 13, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.