UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| David M. O'Neil,<br><br>                   Plaintiff,<br><br>     v.<br><br>Putnam Retail Management Limited Partnership,<br><br>                  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 05-10469 PBS |

## DEFENDANT'S ASSENTED TO MOTION TO FILE REPLY BRIEF

Defendant Putnam Retail Management Limited Partnership ("Putnam") hereby moves to file Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss All Counts of the Complaint pursuant to Fed. R. Civ. P. 7 and Local Rule 7.1(b)(3).  As grounds for this Motion, Putnam states that the reply brief will assist the court in understanding the issues raised in Plaintiff's Opposition to Defendant Putnam Investment's Motion to Dismiss All Counts of the Complaint.  This Motion is unopposed by Plaintiff.

Putnam Retail Management Limited Partnership,

By its attorneys,

_Louis Rodriques_

Louis A. Rodriques, BBO #424720
Cynthia M. Guizzetti, BBO #653858
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: June 13, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on June 13, 2005.

Cynthia M. Guizzetti

LITDOCS/604523.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| David M. O'Neil,<br><br>                            Plaintiff,<br><br>        v.<br><br>Putnam Retail Management Limited Partnership,<br><br>                          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION<br>)    NO.  05-10469 PBS<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS ALL COUNTS OF THE COMPLAINT**

Defendant Putnam Retail Management Limited Partnership ("Putnam") respectfully submits this Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss All Counts of the Complaint.

**I.**     **USERRA Is A New Act Of Congress That Altered The Available Causes Of Action And Is Subject To 28 U.S.C. §1658.**

        **A.**     **USERRA Is A New Act Of Congress For Purposes Of 28 U.S.C. §1658.**

As addressed in Putnam's principal brief, USERRA is a new Act of Congress and thus is governed by §1658.  By repealing the VRRA and adding a new section to the United States Code, USERRA is an entirely new, stand-alone section of the Code on its face – sections which the Supreme Court recognizes in Jones to be new Acts of Congress unquestionably subject to §1658.  See Jones v. R.R. Donnelley & Sons Co., 124 S.Ct. 1836, 1844 (2004) (acknowledging that "new, stand-alone statutes" are presumptively new Acts of Congress.).

Unable to circumvent this holding, Mr. O'Neil asserts that the First Circuit "recognized" that USERRA is an amendment to the VRRA.  See Lapine v. Town of Wellesley, 304 F.3d 90 (1st Cir. 2002).  However, Lapine's casual reference to USERRA as an amendment to the VRRA was in dicta located in a footnote and is of no utility here since the Court of Appeals was not considering whether USERRA was an amendment for purposes of §1658.  Id. at 93, n.1

(considering whether plaintiff qualified for reemployment under the VRRA, not USERRA).[1] Those cases that have addressed the issue squarely have held that USERRA is a new Act of Congress. See Rogers v. City of San Antonio, 2003 WL 1566502, *7 (W.D. Tex. 2003) (holding USERRA is a new Act of Congress for purposes of §1658); Quick v. Deluxe Corp., No. 4:04-CV-396 (CEJ), 7 (E.D. Mo. March 18, 2005) (same).[2]

Nor does Mr. O'Neil's argument that USERRA codifies and expands existing case law governing veteran's rights preclude USERRA from being a new Act of Congress. See U.S. v. Maui County, 298 F.Supp.2d 1010, 1012-13 (D. Hawaii 2003) (rejecting defendant's argument that Religious Land Use and Institutionalized Person Act ("RLUIPA") was not subject to §1658 where RLUIPA was enacted by Congress in 2000, even though it codified existing precedent).

**B. Even As An Amendment To The VRRA, USERRA Is Still A New Act Of Congress For §1658 Purposes.**

**1. A Change In The Causation Standard Is A Fundamental Change To The Cause Of Action.**

Mr. O'Neil concedes that under Jones, if his claims were made possible by USERRA they are subject to §1658. He tries to evade the effect of Jones, however, by arguing that USERRA merely modified the standard of proof applicable to his claims – and that such a change does nothing to alter his causes of action. This argument is without merit.

The only case cited by Mr. O'Neil to support his claims fails to address whether a new cause of action arose at all as a result of a change in the standard of proof, let alone in the context of the applicability of §1658. See Desert Place, Inc. v. Costa, 539 U.S. 90 (2003). In contrast, Jones held that "[w]hat matters [in determining whether an amendment nevertheless "made possible" a cause of action] is the substantive effect of an enactment – the creation of new rights of action and corresponding liabilities." Jones, 124 S.Ct. at 1844-45 (emphasis added). This is consistent with Rogers, which held that the creation of "new substantive liabilities" as a result of

---

[1] Further, Lapine has not been subsequently cited for the proposition that USERRA is an amendment to the VRRA, particularly in the context of §1658.

[2] But see Akhdary v. City of Chattanooga, 2002 WL 32060140 (E.D. Tenn. 2002) (relying on a case overruled by Jones to hold that USERRA is not a new Act of Congress for purposes of §1658).

the changed causation standard was key to its determination that new causes of action arose under USERRA for purposes of §1658. Rogers, 2003 WL 1566502 at *8.

In fact, the Supreme Court has expressly held that changing the standard of proof alters the underlying cause of action. See, e.g., Crawford-El v. Britton, 523 U.S. 574, 594-95(1998). In Crawford-El, the Court considered whether a plaintiff "must adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment" on a §1983 claim, as held by the Court of Appeals. Id. at 578. In overruling the Court of Appeals, the Supreme Court reasoned that neither the text of §1983 nor any federal statute or rule supported the imposition of the clear and convincing burden of proof on plaintiffs at any stage of litigation. Id. at 594. As a result, the "unprecedented change made by the Court of Appeals in this case . . . lacks any common-law pedigree and alters the cause of action itself in a way that undermines the very purpose of §1983 – to provide a remedy for the violation of federal rights." Id. at 594-95. Consistent with Crawford-El, numerous courts have held that changes in the standard of proof create new causes of action in a variety of contexts.[3] By allowing plaintiffs to prove less than what was required under the VRRA, USERRA is a new Act of Congress for purposes of §1658. See Rogers, 2003 WL 1566502 at *8; Jones, 124 S.Ct. at 1845.

The most direct proof that Mr. O'Neil's claims were "made possible" only by USERRA is Mr. O'Neil's Complaint itself. He specifically pleads that his military status was only one motivating factor behind Putnam's decisions. (Cmplt. ¶¶ 37, 42, 46.) Had he asserted that same

---

[3] See, e.g., Roe ex rel. Roe v. Keady, 329 F.3d 1188, 1194 (10th Cir. 2003) (noting that the standard of proof can be a necessary condition for establishing a cause of action); Robertson v. Allied Signal, Inc., 914 F.2d 360, 379 (3d Cir. 1990) (holding that a products liability plaintiff who cannot meet the causation standard of identifying a manufacturer as opposed to a market share, enterprise, or concerted action causation theory, does not state a cause of action); Cleveland v. Piper Aircraft Corp., 890 F.2d 1540, 1546-47 (10th Cir. 1989) (holding that a cause of action for crashworthiness liability requiring proximate cause precludes a plaintiff from bringing a cause of action for crashworthiness based on indivisible injury); Eaton v. Meneley, 180 F.Supp.2d 1247, 1252 (D. Kan. 2002) (citing Crawford-El for proposition that changing the standard of proof alters the cause of action); Goodman v. President and Trustees of Bowdoin College, 135 F.Supp.2d 40, 51-52 (D. Me. 2001) (same); see also Dichner v. Liberty Travel, 141 F.3d 24, 32-33 (1st Cir. 1998) (discussing how, under the Erie doctrine, federal courts apply the burden of proof required by state law for state causes of action brought in federal courts because burden of proof is substantive law). Hardly a red herring – a change in the standard of proof is a significant and substantive change to a cause of action. See, e.g., Crawford-El, 523 U.S. at 576.

claim under the VRRA, his claim would have been dismissed for failure to state a claim upon which relief can be granted for failure to allege that his military status was the <u>sole factor</u> behind Putnam's actions.  <u>See, e.g.</u>, <u>Monroe v. Standard Oil Co.</u>, 452 U.S. 549, 559 (1981) (requiring proof of sole motivation for VRRA claims); <u>Diaz-Gandia v. Dapena-Thompson</u>, 90 F.3d 609, 615-16 (1st Cir. 1996) (holding genuine issue of material fact as to motivation behind adverse actions precluded summary judgment on VRRA claim); <u>Clayton v. Blachowske Truck Lines, Inc.</u>, 640 F.Supp. 172, 174 (D. Minn. 1986) (granting summary judgment on VRRA claim for defendant where evidence, even viewed in light most favorable to plaintiff, showed that plaintiff was terminated for several reasons besides his military status).  Thus, as pled, Mr. O'Neil's claims are "made possible" only by the reduced causation standard in USERRA.

### 2.   Mr. O'Neil Greatly Overstates The Effect Of §2021(B)(3) On Counts II And III.

In a further attempt to show that USERRA is merely an amendment to the VRRA, Mr. O'Neil claims that because §2021(b)(3) of the VRRA protected reservists' benefits beyond those set out in §2024(d), Counts II and III (for denial of benefits) must have been possible prior to the enactment of USERRA.[4]  In fact, he asserts several times in his brief that this section provided that reservists "shall not be denied retention in employment or promotion or other incident or advantage of employment. . ." (Cmplt. p. 4, 9, 12.)  However, §2021(b)(3) is not so broad as Mr. O'Neil claims.  As evidenced by the dearth of supporting authority in his brief, Mr. O'Neil is unable to prove that a merit-based pay increase and training benefits were "incident[s] or advantage[s] of employment" protected under the VRRA.[5]  Instead, they were made possible (if at all) only by USERRA.

Courts have held repeatedly that reservists do not have unlimited rights to all benefits of

---

[4]  §2021(b)(3) was renumbered 38 U.S.C. §4031(b)(3) and §2024(d) was renumbered 38 U.S.C. §4304 in 1992.  Although Putnam cited the most recent, renumbered sections of the VRRA in its moving brief, Putnam will follow Mr. O'Neil's example of citing the earlier versions to maintain continuity.

[5]  It is also telling that Mr. O'Neil plays somewhat fast and loose in how he describes his claims to a pay raise and to training.  Rather than referring to them as a claim for a pay raise and a claim for training, he refers to them as either a "denial of promotion" or a "denial of benefits."  This play on words does not, however, change the fact that merit-based pay increases and training opportunities were not protected under §2021(b)(3).

LITDOCS/603323.2

employment. See, e.g., Monroe, 452 U.S. at 559-60 (stating that "certainly there is nothing in the legislative history that would indicate Congress intended that reservists were to be entitled to all 'incidents and advantages of employment' accorded during their absence to working employees..."). Instead, §2021(b)(3) protected only against actions with severity on par with "discharge and demotion." See, e.g., Monroe, 452 U.S. at 559 (holding that the purpose of §2021(b)(3) was only to "insure that employers would not penalize or rid themselves of returning reservists after a mere pro forma compliance with §2024(d)); Diaz-Gandia, 90 F.3d at 613-14 ("Since Diaz was neither discharged . . ., nor formally demoted, we must first determine whether he was subjected to a discriminatory employment action 'like demotion,'" citing Monroe, 452 U.S. at 559-60). Because alleged denials of a merit-based pay increase and training opportunities are not like discharge or demotion, Mr. O'Neil's claims were not actionable under the VRRA.[6] Assuming that these two claims are actionable at all, they could only have been "made possible" by USERRA. See Luecht v. Dept. of the Navy, 243 F.3d 566, 2000 WL 1681233, **4 (Fed. Cir. 2000) ("USERRA – enacted in 1994 – enlarged the preexisting statute...) (unpublished decision); cf. Vickers v. City of Memphis, 2005 WL 1076577, *2 (W.D. Tenn. 2005) (holding, unlike the VRRA, USERRA provides a cause of action for harassment due to prior military service).

In fact, the position taken by Mr. O'Neil as to the breadth of §2021(b)(3) was explicitly rejected by the Supreme Court in its Monroe decision, as evidenced by the dissent's opinion. Monroe, 452 U.S. at 567 (Burger, J., dissenting) (arguing that the plain language of §2021(b)(3) provides broader coverage than discharges and demotions). However, as set forth above, the

---

[6] Mr. O'Neil did not cite to, and Putnam has been unable to identify, any cases decided under the VRRA where a court found merit-based pay increases or training to be incidents or advantages of employment protected by §2021(b)(3). Putnam was able to find cases identifying a denial of an incident or advantage of employment only in much more egregious circumstances. See Diaz-Gandia, 90 F.3d at 614 (employee was assigned to a cubicle without a desk or chair, required to sit apart from his co-workers, and denied work assignments); Carlson v. New Hampshire Dept. of Safety, 609 F.2d 1024, 1027 (1st Cir. 1979) (employee was effectively demoted when his work shift was negatively changed from a weekday to weekend work schedule); Allen v. U.S. Postal Service, 142 F.3d 1444, (Fed. Cir. 1998) (employee denied chance to compete for full-time position); Lang v. Great Falls School Dist. No. 1, 842 F.2d 1046, 1050 (9th Cir. 1988) (employee denied salary increase that accrued merely as a result of longevity). However, given the egregiousness of the incidents involved, these cases are inapposite to Mr. O'Neil's claims at bar.

majority rejected such a broad reading, including legislative history cited by the dissent which suggested that training opportunities and pay increases would be included in the scope of protection afforded by §2021(b)(3). Id. at 569.

**C.  Because USERRA Does Not "Otherwise[] Provide By Law" For A Statute Of Limitations, The Four Year Statute Of Limitations In §1658 Governs Mr. O'Neil's Claims.**

Having failed to sidestep the application of §1658, Mr. O'Neil attempts to avoid the fatal effect of that statute by claiming that case law pre-dating the enactment of §1658 and addressing causes of action also pre-dating the enactment of either USERRA or §1658 (which by its terms applies only prospectively) satisfies the escape clause in §1658. Mr. O'Neil's assertion that case law pre-dating both §1658 and USERRA "otherwise provides" for a limitations period for USERRA is without merit.

As a threshold matter, Mr. O'Neil must concede that the question of whether case law may or may not "otherwise provide by law" for a statute of limitations for USERRA is reached only after USERRA is held to be a new Act of Congress for purposes of §1658 – if USERRA were not a new Act of Congress, §1658 would not apply even initially. 28 U.S.C. §1658 (applying only to Acts that post-date the enactment of §1658). As such, Mr. O'Neil's argument is illogical and misguided on at least two fronts. First, having determined that USERRA is a new Act separate from the VRRA, case law holding that the VRRA is not subject to a statute of limitations is irrelevant to whether USERRA is subject to a statute of limitations. Second, because Congress passed §1658 after the enactment of the VRRA, case law holding that the VRRA is not subject to a statute of limitations did not have to address the impact of §1658, and those cases would not have made any findings as to the intent of Congress for the provision of a statute of limitations for USERRA in light of §1658. Therefore, VRRA case law cannot be controlling as to the application of §1658 to USERRA claims. See Grace v. Thomason Nissan, 76 F.Supp.2d 1083, 1090 (D.Or. 1999) (holding that §1658 applied to claims brought under the Violence Against Women Act of 1994 because the cases relied on by the defendant were not

"controlling in light of the fact that they were decided prior to the enactment of §1658").[7]

Mr. O'Neil's assertion that case law provides a statute of limitations for USERRA claims is contrary not only to the language of the statute, but also to every case and legal commentary Putnam has been able to locate. Instead, §1658's four year limitations period does not apply to causes of action created after 1990 only if a <u>federal</u> <u>statute</u> provides an alternative. <u>See</u> D. Siegel, <u>The 1990 Enactment of a Uniform Statute of Limitations on Federal Claims</u>, Practice Commentary to 28 U.S.C. §1658 ("The phrase with which §1658 opens, 'Except as otherwise provided by law', means that §1658 . . . will defer to any <u>statute</u> that addresses a given claim <u>more specifically</u>.") (emphasis added); <u>Dell v. Board of Educ., Tp. High School Dist. 113</u>, 32 F.3d 1053, 1066 (7th Cir. 1994) (". . . in the absence of a more <u>explicit legislative directive</u>, a limitations period of 4 years is applicable. . .") (emphasis added); <u>Grace</u>, 76 F.Supp.2d at 1090 (holding that the four year period "applies if . . . there is no <u>explicit legislative directive</u> to apply a different limitation period.") (emphasis added).

Furthermore, Mr. O'Neil's use of case law pre-dating §1658 and USERRA is plainly contrary to the Supreme Court's reasoning and holding in <u>Jones</u>. Had the Supreme Court followed the reasoning suggested by Mr. O'Neil, the Court would have applied earlier case law that would have required the Court to "apply 'the most appropriate or analogous state statute of limitations' to claims based on asserted violations of §1981." <u>Jones</u>, 124 S.Ct. at 1839, <u>citing</u> <u>Goodman v. Lukens Steel Co.</u>, 482 U.S. 656, 660 (1987). Instead, the Court applied the four year statute of limitations provided for in §1658.

Finally, Mr. O'Neil provides a long string cite of cases that purport to show that the only time-bar to USERRA claims should be laches. However, of the seven cases cited, all of them are

---

[7] <u>Douglass v. General Motors Corp.</u>, 2005 WL 1039148 (D. Kan. 2005), is completely irrelevant to the question of whether case law, as opposed to statutes, can "otherwise provide by law" for a statute of limitations. First, <u>Douglass</u> actually holds that a <u>statute</u> provides for a limitations period. <u>Douglass</u>, 2005 WL 1039148 at *10. Second, <u>Douglass</u> does not address the application of §1658 at all. Third, even if <u>Douglass</u> had addressed §1658, it would not apply as the cause of action pre-dated the enactment of §1658, and the question of "otherwise provide by law" would not have been reached.

cases that were, or should have been, decided as cases arising under the VRRA.[8] Therefore, Mr.

O'Neil seriously misconstrues these cases as holding that <u>USERRA</u> is subject only to laches.[9]

### D.    Courts Should Apply §1658 To Avoid Nullifying The Statute *De Facto*.

Mr. O'Neil's reading of §1658 – that "Congress's stated purpose in enacting section 1658

was [only] to prevent the uncertainty and inefficiency created by federal courts applying

different state statutes of limitation to federal causes of action." – is contrary to the principal

purpose of the Civil Justice Reform Act of 1990, which gave rise to the enactment of §1658.  In

contrast to Mr. O'Neil's narrow reading, the purpose of the Act was to reduce costs and delays in

federal civil litigation.  S. Rep. 101-416, <u>reprinted in</u> 1990 U.S.C.C.A.N. 6802, 6808-09 (". . .

<u>delays</u> throughout the courts of litigation not only often inure to the benefit of one side over

another but also increase court backlog, often inhibit the full and accurate determination of the

facts, interfere with the deliberate and prompt disposition and adjudication of cases and thereby

contribute to high litigation transaction costs.") (emphasis added).[10]  Instead, Congress intended

---

[8] Although two cases were decided after the enactment of USERRA, both are really VRRA cases.  In <u>Miller</u>, while the court did not expressly decide whether the VRRA or USERRA would have applied, it correctly suggested that the VRRA would apply as the plaintiffs' causes of action predated USERRA.  <u>Miller v. City of Indianapolis</u>, 281 F.3d 648, 653 (7th Cir. 2002).  The court did apply laches to the plaintiffs's claims, but did so only because the plaintiffs' over twenty year delays were so egregious as to easily warrant its imposition.  <u>Id</u>. at 653.  <u>Garner</u> is similarly unhelpful.  Although <u>Garner</u> did hold that USERRA does not contain an express statute of limitations and USERRA claims are subject only to laches, it inexplicably is void of any discussion on the application of §1658.  <u>Garner v. Yellow Freight Sys., Inc.</u>, 19 Fed. Appx. 834, 836; 2001 WL 1173258 (10th Cir. 2001).  Moreover, the plaintiff's cause of action in <u>Garner</u> predated USERRA, rendering the court's application of USERRA questionable at best.

[9] Mr. O'Neil further cites to the Department of Labor proposed regulations stating its position that USERRA is subject only to laches.  However, Mr. O'Neil neglects to quote the entire discussion of a limitations period, tellingly, by omitting the Department's request for comments on the validity of its view in light of the conflicting court decisions of <u>Rogers</u> and <u>Akhdary</u> (discussed in Putnam's moving brief), and the Supreme Court's decision in <u>Jones</u>.  <u>See</u> Veterans' Employment and Training Service, U.S. Department of Labor, Regulations Under the Uniformed Services Employment and Reemployment Rights Act of 1994, 69 Fed. Reg. 56,266 (Sept. 20, 2004) (proposed rules).  Moreover, the Department's position should be given little, if any, weight because (i) these are only <u>proposed</u> rules, and (ii) a court "must reject administrative constructions of [a] statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." <u>See</u> <u>Federal Election Comm'n. v. Democratic Senatorial Campaign Comm.</u>, 454 U.S. 27, 31-32 (1981).

[10] Furthermore, in the absence of evidence to the contrary, courts must assume that Congress was aware of §1658 when it enacted USERRA in 1994.  <u>Copeland v. Novartis Pharm. Corp., Novartis Nutrition Corp.</u>, Civ. Act. No. CV-04-J-1159-S, *5 (N.D. Ala. Sept. 22, 2004) (". . . Congress could have chosen to exclude USERRA from the reach of the catch-all limitations provision.  Congress made no such exception for USERRA, and the inference can thus be made that Congress intended for §1658 to apply to USERRA claims.").

LITDOCS/603323.2

to ensure that <u>all</u> federal causes of action are subject to a statute of limitations; any other interpretation swallows the rule. <u>See Jones</u>, 124 S.Ct. at 1844 ("The history that led to the enactment of §1658 strongly supports an interpretation that fills more rather than less of the void that has created so much unnecessary work for federal judges."); 136 Cong. Rec. S17570-02, *S17581 (not making any exceptions to statement that "[s]tatutes of limitations provide a specific time period after the contested event within which a case must be commenced."). Where the alternative to applying §1658's four year statute of limitations is not to apply a limitations period at all, courts should interpret statutes to fulfill the purpose behind §1658. <u>See Jones</u>, 124 S.Ct. at 1844 (suggesting that courts interpret §1658 broadly rather than narrowly).

## II.    The Implied Promise Pled By Mr. O'Neil Is Too Ambiguous To State A Claim For Promissory Estoppel.

Having seen that his claim for breach of implied contract fails under the employee handbook line of cases, Mr. O'Neil attempts to assert a promissory estoppel argument. However, Mr. O'Neil still fails to state a claim upon which relief can be granted by failing to allege an adequate promise. <u>See, e.g.</u>, <u>Santoni v. Federal Deposit Ins. Corp.</u>, 677 F.2d 174, 179 (1st Cir. 1982) ("The first essential element of promissory estoppel is that the promisor has made a binding offer in the form of a promise.") (applying Massachusetts law). Mr. O'Neil claims for the first time in his brief that Putnam impliedly promised to transfer his NASD licenses by "requiring him to submit a U4."[11] However, an implied promise of this nature is too ambiguous to state a claim for promissory estoppel. <u>See Upton v. JWP Businessland</u>, 682 N.E.2d 1357, 1360 (Mass. 1997) (summary judgment granted in absence of unambiguous promise in contractual sense, <u>i.e.</u>, where record only showed that "plaintiff asked about regular work hours and was so told"); <u>DiGaetano v. Lawrence Firefighters Federal Credit Union</u>, 2002 WL 31667318, *4 (Mass. Super. Ct. 2002) (court cannot infer an unambiguous promise where

---

[11] Because the <u>Complaint</u> states only that he submitted a U4 to Putnam and reasonably assumed that Putnam would complete the transfer process, it is upon this statement only that a promise must be found for Mr. O'Neil to withstand this motion to dismiss. However, even if Mr. O'Neil is allowed to amend his Complaint <u>de facto</u> in his brief, he still has not alleged a promise sufficient to withstand dismissal.

plaintiff can only point to request to prepare five year profitability analysis as basis for alleged promise to employ plaintiff for five years).

Mr. O'Neil's Complaint fails to provide any information about how a U4 is processed. Accordingly, there is no support for his conclusion that Putnam made an unambiguous promise to him that his licenses would be transferred.  Importantly, NASD Regulation 1140(c) provides that Putnam's role in the transfer process is limited to filing a U4 on behalf of a person applying for registration.  It is the NASD that maintains control over whether a registration becomes effective.  See Ex. E (attached to principal brief).  Therefore, it was unreasonable for Mr. O'Neil to assume that Putnam implied it would, or even could, promise to transfer his licenses.[12]

### III.    Because Mr. O'Neil Could And Should Have Known His Licenses Were Not Transferred, He Cannot Now Hide Behind The Discovery Rule.

As stated in Putnam's principal brief, Mr. O'Neil's implied contract claim is barred by the six year statute of limitations applicable to contract claims.  Mass. Gen. Laws ch. 260, §2. Despite Mr. O'Neil's best efforts, he cannot use the discovery rule to toll the accrual date of his contract claim because the alleged breach was inherently knowable.  See, e.g., Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 126 (Mass. App. Ct. 1990).[13]

While Mr. O'Neil states in his brief that "[he] has no way of knowing that Putnam did not properly transfer his securities licenses . . .," he fails to explain why it was unknowable.  In fact, Mr. O'Neil easily could have discovered the alleged breach by exercising some modicum of reasonable diligence, making the discovery rule inapplicable.  See Frank Cooke, 406 N.E.2d at

---

[12] Although what actually occurred has yet to be established, at best Mr. O'Neil argues (although Putnam denies) that Putnam was responsible for transferring his licenses.  Assuming for the purposes of argument only that is the case, this situation can be likened to one in which an employee is invited by a company to apply for a company credit card.  The company makes an application available to an employee and facilitates sending it to the credit card company.  However, at no time has the company promised that the credit card company will issue the card.  In fact, the company is incapable of making such a promise, because only the credit card company can determine who is eligible for the credit card.

[13] Cases in which the discovery rule has been applied to actions for breach of contract have been limited to contracts for professional services.  See, e.g., Frank Cooke, Inc. v. Hurwitz, 406 N.E.2d 678, 684 (Mass. App. Ct. 1980) (citing cases).  For instance, a plaintiff may rely on the discovery rule where he otherwise could discover the breach only by exercising an unreasonable degree of surveillance, such as by hiring a professional to recognize professional negligence giving rise to his cause of action.  Id.; Anthony's Pier Four, Inc. v. Crandall Dry Dock Engrs., Inc., 489 N.E.2d 172, 176-177 (Mass. 1986).

684 (holding that when a minimal inquiry would have disclosed a breach, plaintiff should have known of the facts giving rise to the cause of action, and therefore could not avail himself of the discovery rule); Int'l Mobiles Corp., 560 N.E. 2d at 126 (holding that the discovery rule is unavailable where plaintiff should have been able to discover facts giving rise to the cause of action without unreasonable efforts).

For example Mr. O'Neil could have followed up with the NASD to see if his U4 had been processed over the course of the 17 months of his employment, or he very easily could have discovered the status of his licenses simply by asking Putnam's Legal Department for the status of the transfer process. However, Mr. O'Neil did neither, nor does he allege to have done either. Therefore, Mr. O'Neil's bald assertion that the discovery rule applies should be afforded no weight.

Mr. O'Neil attempts to bolster the reasonableness of his failure to follow up on the transfer process by asserting that Putnam was required to transfer his licenses before he could perform his job.[14]  However, this only further evidences his lack of reasonable diligence in failing to follow up on the transfer process.  Under NASD rules, if a particular job requires a person to be licensed, a person recently hired by a new securities firm must wait until the transfer process is completed before he may begin working in that capacity.  See NASD Qualifications Frequently Asked Questions - Registration, available at www.nasd.com (attached hereto as Exhibit A).  If Mr. O'Neil really believed that he needed his license to do his job, is it hardly conceivable that he did not, or could not, inquire as to its status.  Any modicum of reasonable diligence would have revealed in less than 17 months whether an employee had been issued a necessary license.

### Conclusion

For the above stated reasons, Mr. O'Neil's Complaint should be dismissed with prejudice in its entirety.

---

[14] Putnam denies that Mr. O'Neil required any licenses to perform his job as a Retirement Plans Specialist.

**Putnam Retail Management Limited Partnership,**

By its attorneys,

Louis A. Rodriques, BBO #424720
Cynthia M. Guizzetti, BBO #653858
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: June 13, 2005

- 12 -

Last Updated: 4/22/03

# Qualifications Frequently Asked Questions - Registration

Following are frequently asked questions (FAQ) about NASD registration and qualification requirements. Click on the links below to view all sections of the FAQ. To submit questions that do not appear in this document, please send us an e-mail.

Membership | Examinations | Registration | Foreign Associates
Branch Office/Office of Supervisory Jurisdiction | Research Analysts

---

**R1. Who must register as a representative?**

**A.** Anyone actively involved in the member's investment banking or securities business must be registered as a representative with NASD. Their duties may include supervision, solicitation, or training of persons associated with the member.

*[NASD Membership and Registration Rule 1031(b) - Definition of Representative]*

**R2. Who must register as a principal?**

**A.** Persons associated with a member, enumerated below, who are actively engaged in the management of the member's investment banking or securities business, including supervision, solicitation, conduct of business, or the training of persons associated with a member for any of these functions are designated as principals. Such persons shall include:

- Sole Proprietors
- Officers
- Partners
- Managers of Offices of Supervisory Jurisdiction, and
- Directors of Corporations.

*[NASD Membership and Registration Rule 1021(b) - Definition of Principal]*

**R3. What registration is required to sell Municipal Fund Securities or 529 College Savings Plans?**

**A.** In order to participate in municipal fund securities transactions, an associated person of a member firm would be required to register as a Municipal Securities Representative (Series 52), General Securities Representative (Series 7), or Investment Company Products/Variable Contracts Limited Representative (Series 6). For more information, refer to the MSRB Web site.

**R4. As a Series 24 or Series 26 Principal, can I supervise transactions in Municipal Fund Securities or 529 College Savings Plans?**

**A.** In order to supervise transactions in these securities, the Series 24 or Series 26 principal will be required to register as a Municipal Fund Securities Principal and pass the Series 51 Examination. The study outline for this examination is available from the MSRB Web site.

**R5. I am currently registered with Series 6 and 22. To supervise mutual fund and DPP sales, can I sit for the Series 24 examination?**

**A.** No. Series 6 and 22 do not satisfy the prerequisite requirement for the Series 24. You do, however, have two options. First, you could take the Corporate Securities Representative Examination (Series 62) which is a prerequisite for the Series 24. Or, second, you could take the Investment Company Products/Variable Contracts Limited Principal Examination (Series 26), and the Direct Participation Programs Limited Principal Examination (Series 39).

*[NASD Membership and Registration Rules 1021(d) and 1022(a) - Application for Principal Status; and General Securities Principal]*

**R6. What are the registration and qualification requirements for a member firm's chief compliance officer?**

**A.** The chief compliance officer must be designated on Schedule A of a member's Form BD and must be registered as a General Securities Principal (Series 24). If the member's activities are limited to particular areas of the investment banking or securities business, the chief compliance officer may apply for a limited principal registration, such as the Limited Principal Investment Company and Variable Contracts Products (Series 26), Limited Principal Direct Participation Programs (Series 39), and Government Securities Principal. For more information refer to Notice to Members 01-51.

**R7. Does NASD accept the NYSE Compliance Official Examination in lieu of the NASD qualification examinations?**

**A.** Yes, to avoid imposing duplicative examination requirements on dual NASD/NYSE members, NASD will accept, for purposes of chief compliance officer registration, the NYSE Series 14 Compliance Official examination in lieu of the NASD Series 24, Series 26, or Series 39 principal examinations. However, note that the chief compliance officers who passed the Series 14 Examination will be required to satisfy the pre-requisite requirement before the general securities principal approval is granted.

**R8. Is there a registration requirement for chief compliance officers who are also general counsels?**

**A.** All chief compliance officers, including those who also serve as a firm's general counsel, must be registered in a principal capacity.

**R9. Is there a registration requirement for general counsels who are not chief compliance officers?**

**A.** A firm's general counsel who solely provides legal advice and does not participate in the management of the member or have management level supervisory responsibilities is not required to register in a principal capacity. In addition, a member's general counsel may advise the firm's executive, management, or operations committees and avoid triggering the registration requirement if he or she only provides counsel and does not vote.

**R10. Must the immediate supervisor of an active registered equity trader be registered under the Series 55?**

**A.** Yes. This is specifically required by NASD Rule 1032(f).

**R11. Can I solicit customer accounts once my firm submits the Form U-4 and fees for me to NASD, but before my registration becomes effective?**

**A.** No. You may not perform registered representative functions until your registration becomes effective with all regulatory organizations and state securities commissions. You may work in other areas at the securities firm if the tasks do not require registration.

**R12. Can I continue to service my customers' accounts before my re-registration becomes effective with my new employer member?**

**A.** No. You may not transact any securities business until your registration with your new employer member becomes
effective.

**R13. If a friend who is not registered with NASD refers clients to me, may I pay him a commission for these referrals?**

**A.** No. You cannot share commissions generated from securities transactions with non-registered individuals.

**R14. Can I maintain an active registration with two NASD member firms concurrently?**

**A.** NASD does not prohibit an individual from maintaining concurrent registrations, but both member firms must agree to this arrangement. You must be sure that this dual affiliation does not violate the registration requirements of other regulatory organizations or state securities commissions.

**R15. How long will my qualification examinations be valid after I end my affiliation with an NASD member firm?**

**A.** You may reactivate your representative or principal exam up to two years after your registration has been terminated. (Note, the two years are calculated from the employment end date with the prior employer or from the CE inactive date.)

*[NASD Membership and Registration Rules 10212(c) and 1031(c) - Requirements for Examination on Lapse of Registration]*

**R15a. What do "CE inactive" or "CE 2-year termed" on my CRD registration mean?**

**A.** Any registered persons who have not completed the Continuing Education Regulatory Element program within the prescribed time frames will have their registrations deemed inactive until such time as the requirements of the program have been satisfied. Any person whose registration has been deemed inactive under Rule 1120(a)(2) shall cease all activities as a registered person and is prohibited from performing any duties and functioning in any capacity requiring registration. A registration that is inactive for a period of two years will be administratively terminated. A person whose registration is so terminated may reactivate the registration only by reapplying for registration and meeting the qualification requirements of the applicable provisions of the Rule 1020 Series and the Rule 1030 Series.

*[NASD Membership and Registration Rules 1120(a)(2) - Regulatory Element--Failure to complete]*

**R16. How do I reinstate my registration with NASD-I've been out of the industry for more than two years?**

**A.** A member firm must sponsor you and you must re-qualify by examination.

*[NASD Membership and Registration Rule 1021(c) and Rule 1031(c) - Requirements for Examination on Lapse of Registration]*

**R17. I passed the Series 7 test. Now I want to join a Direct Participation Program broker/dealer. Will I lose my general securities status if this new firm registers me as a DPP representative?**

**A.** You may join a DPP broker/dealer without losing your general securities status. This applies to re-registration in any limited representative category.

*[NASD Membership and Registration Rule 1031-Registration Requirements]*

**R18. I was a general securities principal. Now I am with a new firm and will only register as a general securities representative. Will I lose my principal status?**

**A.** If you do not reregister as a principal within two years of your last principal registration, the principal qualification will lapse. You must then retest to function in that capacity in the future.

*[NASD Membership and Registration Rules 1031(a) and 1031(c) - Registration Requirements; and Requirements for Examination on Lapse of Registration]*

**R19. After my firm submitted a Form U-4 and fees through the Web CRD system for me, I decided not to become registered with NASD. I would like a refund of these fees.**

**A.** As stated in Schedule A to the NASD By-Laws, fees are not refundable.

*[Schedule A to NASD By-Laws, Resolution of the Board of Governors]*

**R20. I am joining an NASD member firm as a consultant to hold public seminars promoting its products and services. Should I register since this firm does not technically employ me?**

**A.** The activity you describe requires registration as a representative or principal. Your employment status does not affect your involvement in the member's investment banking or securities business.

*[NASD Membership and Registration Rules 1020 and 1030 Registration of Principal and Representative]*

**R21. I am an independent contractor (not an employee) of a large insurance company. I refer potential customers to this firm. Should I become registered?**

**A.** Under NASD rules, job performance determines the registration requirement. You must therefore be registered if you solicit client accounts for a member firm regardless of the terms of your contract with this firm.

*[NASD Membership and Registration Rule 1021(b) and Rule 1031(b) - Definition of Principal and Definition of Representative]*

**R22. Can a firm hire unregistered individuals whose sole function will be to cold call potential customers?**

**A.** Member firms may employ unregistered individuals for the purposes of: Extending invitations to firm-sponsored events at which presentations and account or order solicitation will be conducted by appropriately registered personnel; Inquiring whether the prospective customer wishes to discuss investments with a registered person; Determining whether the prospective customer wishes to receive investment literature from the firm. The firms employing unregistered persons to perform these functions must be sure these employees do not discuss general or specific investment products or services offered by the firm, prequalify prospective customers as to financial status, investment history, and objectives, or solicit new accounts or orders.

*[NASD Membership and Registration Rule 1031(b) - Definition of Representative]*

**R23. A DPP broker/dealer firm hired me to wholesale its securities products to other broker/dealers. Do I have to register with NASD to perform this function?**

**A.** Yes. You must register with NASD to function as a wholesaler because you will offer securities to other broker/dealers.

*[NASD Membership and Registration Rule 1031(b) and Rule 1032(c) - Definition of Representative; and Limited Representative Direct Participation Programs]*

**R24. While registered with member firm "A," can I sell limited partnership interests for non-member firm "B" in a private placement?**

**A.** To participate in a private securities transaction, you must provide your employer member written notice describing the proposed transaction and your role in this activity. You must also notify your employer member whether you have received or will receive selling compensation in connection with the transaction. The member must provide you a written statement advising whether it approves or disapproves your participation in the proposed transaction. If the member allows such activity, the member must record the transaction(s) on its books and records. The member must also supervise your participation in the transaction.

*[NASD Conduct Rule 3040 - Private Securities Transactions of an Associated Person]*

**R25. A broker/dealer wants to employ me to sell securities only to institutions. I will not have any retail customers. Do I have to register with NASD?**

**A.** Yes. Under NASD rules anyone associated with a member who engages in the investment banking or securities business for the member must register. The rules do not distinguish between retail and institutional securities customers.

Case 1:05-cv-10469-PBS    Document 10-2    Filed 06/13/2005    Page 17 of 18

*[NASD Membership and Registration Rules 1021 and 1031 - Registration Requirements for Principals and Representatives]*

**R26. I am currently registered with the Series 6. May I also become registered as an assistant representative-order processing?**

**A.** The assistant representative-order processing is a stand-alone registration category. An individual cannot maintain another valid registration concurrently with the Series 11. Your firm would, therefore, have to terminate your Series 6 registration before requesting the Series 11 for you.

*[NASD Membership and Registration Rule 1042 - Registration of Assistant Representatives - Order Processing-Restrictions]*

**R27. We have a staff of telephone operators who provide yield quotations to callers. Must they register with the Series 11?**

**A.** No. If the operators provide published yield quotations only to the firm's clients, they do not have to be registered with NASD in any capacity.

**R28. Must telephone operators at a member firm who accept unsolicited orders from customers register as assistant representatives-order processing?**

**A.** Yes. If the operator accepts unsolicited customer orders from the firm's customers for execution by the member firm, the operator must be registered.

*[NASD Membership and Registration Rule 1041(b) - Definition of Assistant Representative - Order Processing]*

**R29. Must telephone operators at a member firm who accept unsolicited customer orders for transfers within a family of funds be registered with NASD?**

**A.** No. This function is considered clerical and does not require registration.

**R30. Do I need to register if I will only be selling exempt securities?**

**A.** Yes. The terms "Exempt Securities" and "Exempt Transactions" mean these particular securities or transactions (private placements or intrastate offerings) are exempt from the filing requirements of the Securities Act of 1933. Anyone dealing with Exempt Securities and/or Exempt Transactions, however, must register.

*[Securities Act of 1933 Sections 3 and 4]*

**R31. I am setting up a muni-only broker/dealer, how many principals must register with this firm? How must they register?**

**A.** The firm must have two qualified municipal securities principals and a financial and operations principal.

*[MSRB Rule G-3(b)(l) and (ii) - Municipal Securities Principals and Financial and Operations Principals]*

**R32. I am setting up a broker/dealer that will deal in corporate securities and municipal securities transactions. How many principals must be registered with the firm? How must they register?**

**A.** The firm must have two qualified general securities principals, one municipal securities principal, and one financial and operations principal.

*[NASD Membership and Registration Rules 1021(e), 1022(a) and (b) - Requirement of Two Registered Principals for New Applicants for Membership; Categories of Principal Registration-General Securities Principal and Limited Principal Financial and Operations]*

Case 1:05-cv-10469-PBS    Document 10-2    Filed 06/13/2005    Page 18 of 18

©2005 NASD. All rights reserved. | Legal Notices and Privacy Policy.