```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

```
_____
                               )
DAVID M. O'NEIL,               )
                               )
          Plaintiff,           )
                               )
     v.                        )   CIVIL ACTION NO.
                               )   05-10469-PBS
PUTNAM RETAIL MANAGEMENT LLP   )
d/b/a PUTNAM INVESTMENTS,      )
                               )
          Defendant.           )
_____)
```

**MEMORANDUM AND ORDER**

December 21, 2005

Saris, U.S.D.J.

## I. INTRODUCTION

Plaintiff, David M. O'Neil claims that he was terminated from his job at defendant, Putnam Retail Management Limited Partnership ("Putnam"), because of discrimination based on his status as a member of the United States Navy Reserves, in violation of the Uniformed Services Employment and Re-employment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq*. (1994). He also asserts that defendant violated an implied contract to transfer his securities licenses.[1] Defendant moves to dismiss on the grounds that both claims are time-barred and that plaintiff

---

[1] The Complaint asserts claims of wrongful termination in violation of USERRA (Count I); denial of training and advancement of employment in violation of USERRA (Count II); denial of a raise in violation of USERRA (Count III); breach of implied contract (Count IV).

failed to allege the required elements of an implied contract. After hearing and review of the briefs, the motion is **ALLOWED** with respect to Counts I, II, and III, and **DENIED** with respect to Count IV.

## II.  FACTUAL BACKGROUND

The complaint alleges the following facts, many of which are disputed. O'Neil is an Aviation Electrician's Mate and Plane Captain in the United States Navy. Putnam is a global money management and investment firm which is a member of the National Association of Securities Dealers and hired O'Neil as a Retirement Plans Specialist in 1997.

O'Neil came to Putnam with ten years of experience in the investment community. During his initial interview in September 1997, O'Neil informed Putnam that he was a United States Navy reservist.

When he began working at Putnam in October 1997, O'Neil immediately submitted a Uniform Application for Securities Industry Registration or Transfer ("U4") in order for Putnam to seek transfer of his licenses. After he submitted the U4, he assumed that Putnam completed this process of transferring the licenses, required by the Securities and Exchange Commission for the work he performed as a Retirement Plans Specialist. O'Neil did not learn until he was terminated in July 1999 that Putnam had never transferred his licenses, so not only had he been

working in that position without them, but the licenses had also expired and were no longer available to him to find employment elsewhere.

In approximately March 1998, he notified his superiors that he would need to go to an annual two-week training for reservists in June 1998.  His supervisors approved of the time away for his military duties.  Two days before he was scheduled to leave, however, his immediate supervisor, Jeff Ryan, informed O'Neil that the department head, Ian McGregor, wanted him to cancel his reserve duty and attend a training session at Putnam.  When O'Neil replied that it was too late because he had already received his orders, McGregor was upset.  Ryan, however, reassured him that he had used the correct procedures for requesting the time.  When O'Neil returned from his reserve duty, he found that his name had been placed on the bottom of the training schedule below employees over whom he had significant authority.  Ryan told him that McGregor "wanted it that way" because O'Neil had not rescheduled his reserve training.

In October 1998 and December 1998, O'Neil received written warnings regarding two incidents of employee misconduct.  One involved rudeness and the other excessive sick time.  Throughout this period, O'Neil's name remained at the bottom of the list for training at Putnam, below employees who were new to the company.  Plaintiff believes Putnam denied him this training (which was required for advancement and promotion at Putnam)

because of his reserve status.

In December 1998, while beginning another two-week drill period, O'Neil was ordered by the Navy to active duty in support of Operation Desert Fox.  Due to the nature of the Operation, he was not allowed to notify anyone about his change in orders until another two weeks had passed.  At that time, O'Neil telephoned Ryan to inform him of his whereabouts, and Ryan assured him that it would not affect his job and that he just needed to bring in a copy of his orders when he returned.

In February 1999, Ryan informed O'Neil that he would not receive the normal pay increase for that year because (1) he had received two warnings, and (2) his reserve duty in support of Operation Desert Fox had caused him to be absent for five weeks instead of two weeks without prior notice.  Ryan then told O'Neil that he had been "instructed" to tell him that he needed to decide between staying at Putnam or remaining a member of the United States Navy and that he had until his semi-annual counseling session to make that decision.  O'Neil expressed his desire to remain at Putnam, but reminded Ryan that it is illegal for Putnam to require such a choice.

In May 1999, O'Neil was ordered to active duty in support of operations in Kosovo.  He was away from work for one month.

In July 1999, O'Neil participated in a drill weekend with the Navy and was detained for one additional night due to a flight delay.  When the Putnam office opened the next morning at

8:00 a.m., he called to report his delay. The next day, O'Neil's new supervisor terminated O'Neil without providing him with a termination letter. Ryan orally advised O'Neil that he was terminated because (1) he was "unprofessional," (2) he had received two warnings, (3) he had "prolonged absences" and "schedule changes."

O'Neil alleges that he suffered significant financial harm from both his termination from Putnam and Putnam's failure to transfer his licenses during the two years he worked there. Since termination, O'Neil was called back into active duty three times and is now on medical leave from the U.S. Navy.

This civil action was filed on March 11, 2005.

### III.  DISCUSSION

**A.  Motion to Dismiss Standard**

For purposes of this motion, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990)). A complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S.

41, 45-46 (1957)).

**B.    Timeliness of Counts I, II & III**

Plaintiff claims that under USERRA he was illegally terminated and deprived of training opportunities and salary increases because of his military service.  Defendant contends that these USERRA claims should be dismissed as barred by the four-year statute of limitations set out in 28 U.S.C. § 1658. Section 1658 provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."  USERRA contains no explicit federal statute of limitations, but it does specify that state statutes of limitations do not apply.  38 U.S.C. § 4323(i).  The Court must look more closely at § 1658 and USERRA to determine whether the catchall statute of limiations bars plaintiff's claims.

In Jones v. R.R. Donnelly & Sons, 541 U.S. 369 (2004), the Supreme Court addressed the question of whether § 1658 applies to a post-1990 amendment to a previously existing statute.  Jones involved an amendment of 42 U.S.C. § 1981 which, by redefining a term in the original statute, made possible a claim of racial discrimination based on an employment termination and harassing conduct that occurred after the formation of a contract; case law construing the term had previously precluded such causes of

action.  The Supreme Court explained that Congress enacted the "catchall" four-year statute of limitations for Acts of Congress enacted after 1990 to deal with the problem of federal statutes which do not specify a statute of limitations and which required courts to engage in the time-consuming and difficult exercise of determining the most comparable state statute of limitations to borrow.  Id. at 380.  The Court rejected the argument that § 1658 applies only to entirely new sections of the United States Code:

> The history that led to the enactment of § 1658 strongly supports an interpretation that fills more rather than less of the void that has created so much unnecessary work for federal judges.  The interpretation favored by respondent and the Court of Appeals subverts that goal by restricting § 1658 to cases in which the plaintiff's cause of action is based solely on a post-1990 statute that "'establishes a new cause of action without reference to preexisting law.'"  On that view, § 1658 would apply only to a small fraction of post-1990 enactments.  Congress routinely creates new rights of action by amending existing statutes, and "[a]ltering statutory definitions, or adding new definitions of terms previously undefined, is a common way of amending statutes."  Nothing in the text or history of § 1658 supports an interpretation that would limit its reach to entirely new sections of the United States Code.  An amendment to an existing statute is no less an "Act of Congress" than a new, stand-alone statute.  What matters is the substantive effect of an enactment -- the creation of new rights of action and corresponding liabilities -- not the format in which it appears in the Code.

Id. at 381 (citations omitted).

However, not all post-1990 amendments trigger the four-year

statute of limitations.  Concerns about "settled expectations" persuaded the court to "reject an interpretation of § 1658 under which any new amendment to federal law would suffice to trigger the 4-year statute of limitations, regardless of whether the plaintiff's claim would have been available -- and subject to a state statute of limitations -- prior to December 1, 1990."  Id. at 381-82.  As a result, the Court interpreted § 1658 to apply to claims "made possible by a post-1990 enactment."  Id. at 382.

The key question, then, in determining whether the four-year statute of limitations in § 1658 applies is whether plaintiff's claims were available before December 1, 1990, or if they were made possible by USERRA, which was adopted in 1994.  See id. at 384 (noting that no "guess work" is required on the part of the District Court, only a determination of "whether the plaintiff has alleged a violation of the relevant statute as it stood prior to December 1, 1990, or whether her claims necessarily depend on a subsequent amendment").  If the plaintiff's claims existed before the passage of USERRA, then § 1658 does not apply, but if USERRA made the claims possible, then Counts I, II, and III of the complaint are time-barred.

USERRA, 38 U.S.C. §§ 4301-4333, is one of a series of statutes enacted to protect the employment and reemployment of persons serving in the military.  An amendment of the Veteran's Reemployment Rights Act ("VRRA"), which was enacted in 1974, USERRA was intended to "clarify, simplify, and, where necessary,

8

strengthen the existing veterans' employment and reemployment rights provisions."  H.R. Rep. No. 103-65 (1993), reprinted in 1994 U.S.C.C.A.N. 2449, 2451.  The First Circuit has traced the legislative history of USERRA, noting that it "significantly amended" VRRA and that Congress was "careful to note changes to the law that represented a deviation from the VRRA."  Lapine v. Town of Wellesley, 304 F.3d 90, 93 n.1, 100 (1st Cir. 2002).  The legislative history of USERRA indicates that "the extensive body of the case law that has evolved . . . to the extent it is consistent with the provisions of this Act, remains in full force and effect in interpreting these provisions."  H.R. Rep. No. 103-65 (1993), reprinted in 1994 U.S.C.C.A.N. 2449, 2452.

Plaintiff argues that § 1658 is inapplicable to his claims under USERRA because the four-year time limit applies "except as otherwise provided by law."  In plaintiff's view, the established case law provides that the only timeliness defense available under VRRA was the equitable doctrine of laches.  See, e.g., Miller v. City of Indianapolis, 281 F.3d 648, 653 (7th Cir. 2002); Garner v. Yellow Freight Sys., Inc., 19 Fed. Appx. 834, 836 (10th Cir. 2001); Stevens v. Tennessee Valley Auth., 712 F.2d 1047, 1054 (6th Cir. 1983).  Because the law on timeliness was settled under VRRA, and Congress expressly indicated an intent not to deviate from past case law, plaintiff argues the Court should not apply § 1258 to USERRA.

Plaintiff's argument (while clever) misses the mark because

it ignores the Supreme Court's taxonomy in Jones.  Section 1658 applies to any claim "made possible" by USERRA, an amendment to VRRA.  Only if the claim pre-exists the enactment of USERRA will the doctrine of laches govern the timeliness inquiry.  To obviate the Jones rationale, plaintiff suggests that the phrase "except as otherwise provided by law" encompasses only those situations where the courts had to fill the void created by a lack of a federal statute of limitations with a state statute of limitations.  While it is true that the enactment of § 1658 was motivated by the practical difficulties of finding an analogous state statute of limitations to borrow, the terms of the statute are not so limited.

The Supreme Court in Jones recognized that the line between an amendment that modifies an existing right and one that creates a new right is often difficult to draw, noting that the courts will have to "determine whether the amendment clarified existing law or created new rights and liabilities."  541 U.S. at 385 n.18.  This case exemplifies that difficulty.  Defendant argues that plaintiff's claim that his military status was "a motivating factor" in the decision to terminate him was made possible only by the amendment.  Plaintiff responds that a claim that defendant was motivated by his military status pre-existed the amendment.  Under Jones, plaintiff must win this point in order to avoid application of § 1658.

In the complaint, Plaintiff alleges that discrimination was

"a motivating factor" for defendant to terminate his employment and otherwise deprive him of a raise and training opportunities. (Compl. ¶ 37, 41, 45.)  Under USERRA, a plaintiff must prove only that an improper animus was a "motivating factor" in the employment decision.  See 38 U.S.C. § 4311(c)(1).  Under VRRA, however, the Supreme Court stated that the plaintiff must allege that discrimination was the sole factor motivating the action. 38 U.S.C. § 2021(b)(3); Monroe v. Standard Oil Co., 452 U.S. 549, 559 (1981) ("The legislative history indicates that § 2021(b)(3) was enacted for the significant but limited purpose of protecting the employee-reservist from discrimination like discharge and demotion motivated solely by reserve status.").

In fact, one of the factors motivating Congress in passing USERRA was to broaden the protections afforded by VRRA as interpreted by the Supreme Court in Monroe.  See H.R. Rep. No. 103-65 (1993), reprinted in 1994 U.S.C.C.A.N. 2449, 2457; see also Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002) ("USERRA replaced the 'sole motivation' test with a more lenient standard that requires only that the employee's military status was 'a motivating factor' in the employer's action."); Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001) ("The USERRA was enacted in congressional response to the Supreme Court's decision in Monroe . . . . The 1994 enactment broadened the statute by providing that violation occurs when a

person's military service is a 'motivating factor' in the discriminatory action, even if not the sole factor."); Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312 (4th Cir. 2001). Moreover, prior to the passage of USERRA, the First Circuit followed Monroe in requiring that discrimination based on military service be the sole factor behind the employer's action. See Diaz-Gandia v. Dapena-Thompson, 90 F.3d 609, 613 (1st Cir. 1996); Boyle v. Burke, 925 F.2d 497, 501 (1st Cir. 1991). As such, plaintiff's claims in Counts I, II, and III that his "military service was a motivating factor" in defendant's decisions were made possible by the passage of USERRA. Under Jones, a four-year statute of limitations applies to the statute, and plaintiff's claims are therefore time-barred.

**C.  Implied Contract Claim**

Plaintiff asserts that defendant breached an implied contract by failing to transfer his licenses. Putnam argues that the claim is untimely under the six-year statute of limitations and that plaintiff has failed to allege sufficient facts to state a claim.

   1.  Timeliness

Under Massachusetts law, when a cause of action in contract is based on an inherently unknowable wrong, the cause of action accrues when the injured party knows or in the exercise of reasonable diligence should know the facts giving rise to the

cause of action.  See Whitcomb v. Pension Dev. Co., Inc., 808 F.2d 167, 169 (1st Cir. 1986); Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 396 Mass. 818, 825-26, 489 N.E.2d 172, 177 (1986) (applying discovery rule to claims for breach of express warranty which did not accrue until the plaintiff knew or reasonably should have known of the breach).

Although the alleged breach of contract occurred outside of the six-year statute of limitations on contract claims, O'Neil argues that the clock did not begin to tick until July 1999, the day he was terminated and on which he first discovered defendant's failure to submit the U4.  Relying on industry rules implemented by the National Association of Security Dealers ("NASD"), plaintiff argues that it was reasonable to assume that his license had been transferred because defendant could not have let him work in a broker's role without the correct license and because defendant had the obligation to register him.  Defendant responds that plaintiff's job did not require a license and, furthermore, that if plaintiff really thought his job required a license under NASD policies, he should not have started working unless he was sure his licenses had been transferred.

When all reasonable inferences are drawn in favor of the plaintiff, at this early stage, his conduct in not scouting out whether Putnam submitted the U4 cannot be deemed so unreasonable as to preclude accrual of the cause of action under the discovery

13

rule in July 1999.

    2.   <u>Failure to State a Claim</u>

Defendant argues that the implied contract count should be dismissed because the complaint never states that Putnam promised it would transfer his licenses. Under Massachusetts law, "[w]hen a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration." <u>Loranger Constr. Corp. v. E.F. Hauserman Co.</u>, 376 Mass. 757, 761, 384 N.E.2d 176, 179 (1978).

Plaintiff alleges that he "assumed" that Putnam would complete the process of transferring the licenses once he submitted the U4 form entitled "Uniform <u>Application</u> for Securities Industry Registration or Transfer" (emphasis added). When all reasonable inferences are drawn in favor of the plaintiff, he has sufficiently alleged that he reasonably expected that defendant would submit the U4 form when plaintiff gave the "application" after accepting the job.

### ORDER

The motion to dismiss is **DENIED** with respect to Count IV and **ALLOWED** with respect to Counts I-III. (Docket No. 3.)

   **S/PATTI B. SARIS**
   UNITED STATES DISTRICT JUDGE